**Mrs. Raymond M. WHEELER et al., Plaintiffs,**

v.

**J. C. GOODMAN, Jr., et al., Defendants.**

**Marc MATIGIAN et al., Plaintiffs,**

v.

**L. A. KELLY et al., Defendants.**

**Bernice Miller HARRIS et al., Plaintiffs,**

v.

**J. C. GOODMAN, Jr., et al., Defendants.**

**James STEELE et al., Plaintiffs,**

v.

**J. C. GOODMAN, Jr., et al., Defendants.**

**Mrs. Cornellius Cuthbertson HILL, Plaintiff,**

v.

**W. A. ROWLAND et al., Defendants.**

**Hiram Kemp HOLMES, Plaintiff,**

v.

**W. A. ROWLAND et al., Defendants.**

Civ. A. Nos. 2431, 2612, 2601, 2606, 2569, 2637.

United States District Court,
W. D. North Carolina,
Charlotte Division.

May 11, 1971.

No. 2431

George S. Daly, Jr., and W. Thomas Ray, Charlotte, N. C., for plaintiffs.

Andrew A. Vanore, Jr., Staff Atty., North Carolina Dept. of Justice, Raleigh, N. C., amicus curiae.

W. A. Watts and Henry W. Underhill, Jr., City Attys., G. Patrick Hunter, Jr., and J. Marshall Haywood, Charlotte, N. C., for defendants.

No. 2612

George S. Daly, Jr., Charlotte, N. C., Norman B. Smith, North Carolina Civil Liberties Union, Greensboro, N. C., for plaintiffs.

Henry W. Underhill, Jr., City Atty., John A. Mraz, James O. Cobb, Frank B. Aycock, III, Charlotte, N. C., and L. P. Covington, Staff Atty., North Carolina Dept. of Justice, Raleigh, N. C., for defendants.

No. 2601

Martin J. Miller, Washington, D. C., George S. Daly, Jr., Charlotte, N. C., of counsel, Norman B. Smith, North Carolina Civil Liberties Union, Greensboro, N. C., for plaintiffs.

W. A. Watts and Henry W. Underhill, Jr., City Attys., G. Patrick Hunter, Jr., and Frank B. Aycock, III, Charlotte, N. C., for defendants.

No. 2606

Martin J. Miller, Washington, D. C., George S. Daly, Jr., Charlotte, N. C., and Norman B. Smith, North Carolina Civil Liberties Union, Greensboro, N. C., for plaintiffs.

Frank B. Aycock, III, Henry W. Underhill, Jr., City Atty., and John A. Mraz, Charlotte, N. C., for defendants.

Nos. 2569, 2637

George S. Daly, Jr., Charlotte, N. C., for plaintiffs.

Frank B. Aycock, III, and Henry W. Underhill, Jr., City Atty., Charlotte, N. C., for defendants.

## OMNIBUS OPINION

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

An order was entered on March 5, 1969, in Wheeler et al. v. Goodman et al., 298 F.Supp. 935 (W.D.N.C., 1969), finding facts about then recent operations of the Charlotte City Police Department, and placing precautionary restraints upon its future operations.

The plaintiffs in *Wheeler* filed a motion on June 25, 1969, requesting contempt proceedings and requesting the appointment of a special master to administer the vice squad of the Department. In the other five captioned cases, subsequently filed, the plaintiffs request damages, or both damages and injunctive relief. The defendants ask dissolution of the *Wheeler* injunction.

The week of November 16, 1970, was devoted to a hearing at which evidence was taken bearing upon the *Wheeler* motions and upon the injunctive relief requested in the other cases. All testimony in all cases will be considered to the extent that it may bear upon the special relief sought in the *Wheeler* case and upon the alleged violations of the *Wheeler* order.

This opinion covers all six cases. It will include the court's findings and conclusions in each case. It will also include the disposition of the Wheeler motions and the disposition, pending final trial on the merits, of the motions in the other cases. Separate orders based on this opinion will be entered in each of the cases.

The findings and conclusions in this order will not be binding upon nor considered by the juries in the later jury trial of any issues in these cases; these findings are for purposes of granting or denying temporary relief only.

### FOURTH AMENDMENT LAW
(Generally)

The Fourth Amendment to the Constitution of the United States provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

\* \* \* \* \* \*

The Supreme Court has said:

" \* \* \* [The Fourth] Amendment's proscriptions are enforced against the states through the Fourteenth Amendment" and " \* \* \* the standard of reasonableness is the same under the Fourth and Fourteenth Amendments \* \* \*." Ker v. California, 374 U.S. 23, 33, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

The Fourth Amendment's proscription against unreasonable searches and seizures protects *people,* not *places,* Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); and this protection extends " \* \* \* as much to the citizen on the streets of our cities as to the homeowner closeted in his study \* \* \*." Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968).

Most decisions interpreting the Fourth Amendment have arisen out of criminal prosecutions. That the questions presented by all the cases now being discussed are not raised in the course of a criminal proceeding is immaterial since the prohibitions of the Fourth Amendment are not limited to searches and seizures resulting in criminal prosecutions. See, Terry v. Ohio, 392 U.S. 1, 12–15, 88 S.Ct. 1868 (1968).

## FOURTH AMENDMENT LAW
### (Searches)

The Fourth Amendment has been interpreted by the United States Supreme Court to require that, except in certain exceptional situations, the police have search warrants to conduct searches.

"This guarantee of protection against unreasonable searches and seizures [the Fourth Amendment] * * * marks the right of privacy as one of the unique values of our civilization and, with few exceptions, stays the hands of the police unless they have a search warrant issued by a magistrate on probable cause supported by oath or affirmation." McDonald v. United States, 335 U.S. 451, 453, 69 S.Ct. 191, 192, 93 L.Ed. 153 (1948).

\* \* \* \* \* \*

"We are not dealing with formalities. *The presence of a search warrant serves a high function.* Absent some grave emergency, *the Fourth Amendment has interposed a magistrate between the citizen and the police.* This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. \* \* \* And so *the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home.* We cannot be true to that constitutional requirement and excuse the absence of

a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." McDonald v. United States, 335 U.S. 451, 455, 456, 69 S.Ct. 191, 193 (1948) (Emphasis added).

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. *When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.*

"*There are exceptional circumstances* in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. * * *" Johnson v. United States, 333 U.S. 10, 13–15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (Emphasis added).

"Belief, however well founded, that an article sought is concealed in a dwell-

ing house furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause." Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925).

Further treatment of these principles appears in United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); and Camara v. Municipal Court, 387 U.S. 523, 528–529, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

■ Searches of a hotel room or other rented premises are subject to the same restrictions as searches of homes. See, Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); and McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

■ The basic rule, then, under which law enforcement officers must operate, as summarized by Justice Stewart in Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), is that:

" * * * [S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."

What are these exceptions?

They appear to include the following:

(a) Search, incident to and contemporaneous with [following] a lawful arrest, of the suspect's person and of areas within his reach or immediate physical control. Such search, when upheld, has been justified as necessary to protect police officers from concealed weapons and to prevent escape of suspects, and to prevent concealment or destruction of fruits or evidence or means of crime. Chimel

v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

(b) Search of a vehicle, which may not be justifiable as incident to an arrest but is based on probable cause to believe that the vehicle contains articles the officers are entitled to seize. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Ease of removal of a vehicle [or boat or airplane] from the scene or from the jurisdiction appears to be the principal rationale of this exception. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

(c) Searches knowingly and voluntarily consented to. See, Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946); Amos v. United States, 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654 (1921); Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); and Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

(d) Search, with probable cause, for and in hot pursuit of a fleeing and dangerous felony suspect. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed. 2d 782 (1967); see also Dorman v. United States, 435 F.2d 385 (D.C.Cir., 1970).

(e) Search of abandoned real estate or personal property. Parman v. United States, 130 U.S.App.D.C. 188, 399 F.2d 559 (1968), cert. denied, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968); Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). See also, Massachusetts v. Painten, 389 U.S. 560, 562, 88 S.Ct. 660, 19 L.Ed.2d 770 (1968) (dissenting opinion).

(f) Search under urgent necessity such as persistent loud screams from within, or knowledge of person inside in acute medical crisis. See, United States v. Barone, 330 F.2d 543 (2nd Cir., 1964), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1967); Wayne v. United States, 115 U.S.App.D.C. 234,

318 F.2d 205 (1963), cert. denied, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); and Vauss v. United States, 125 U.S.App.D.C. 228, 370 F.2d 250 (1966).

(g) Search pursuant to custodial prerogative (as of police in lawful possession of vehicle held for forfeiture). Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) [compare Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964)].

(h) Search, with probable cause, and necessary to prevent loss or destruction of the thing to be seized, United States v. Barone (counterfeit money being flushed down drain), 330 F.2d 543 (2nd Cir., 1964), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1967). See, Johnson v. United States, 333 U.S. 10, 15, 68 S.Ct. 367, 92 L.Ed. 436 (1948), and United States v. Jeffers, 342 U.S. 48, 52, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

Two factors often advanced to justify a search without a search warrant are (1) the existence of an *arrest* warrant, and (2) tips from "reliable informants."

It does not appear that existence of either of these factors justifies a search without a search warrant unless the search comes within one of the otherwise recognized exceptions.

■ In fact, respectable courts have stated [Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449 (1958); see also, Dorman v. United States, 435 F.2d 385, 390 (D.C.Cir, 1970); *contra,* Love v. United States, 170 F.2d 32 (4th Cir., 1948); see, however, Lankford v. Gelston, 364 F.2d 197 (4th Cir., 1966)], that the existence of an arrest warrant does not justify a search without a search warrant. As to tips from reliable informants, they are simply factors that may be considered in establishing probable cause to issue search warrants, and they do not independently constitute one of the exceptions to the search warrant requirement.

The better practice continues to be: Get a search warrant before the search starts.

## FOURTH AMENDMENT LAW
### (Search Warrant Affidavits)

The constitutional standard for search warrant affidavits based on information from "reliable informants" is expressed in Aquilar v. Texas, 378 U.S. 108, 114–115, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964), as follows:

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887, was 'credible' or his information 'reliable.' Otherwise, 'the inferences from the facts which lead to the complaint' will be drawn not 'by a neutral and detached magistrate,' as the Constitution requires, but instead, by a police officer 'engaged in the often competitive enterprise of ferreting out crime,' Giordenello v. United States, 357 U.S. 480, at 486, 78 S.Ct. 1245, at 1250, 2 L.Ed.2d 1503; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, or, as in this case, by an unidentified informant."

See, also, Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

■ It must also be remembered that information known to the police, but not presented under oath to the magistrate, may not be considered in a subsequent judicial determination of a warrant's validity. See Note 1, Aquilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

On September 19, 1969, a "CHECKLIST FOR SEARCH WARRANT AFFIDAVITS" was prepared by the Legal

Advisor's Office of the Charlotte Police Department, and was thereafter distributed to individual police officers. It deals specifically with "reliable informer" warrants and is a useful guide on that subject for police officers. Copy of it is attached to this order as Exhibit "A".

## FOURTH AMENDMENT LAW
### (Arrests)

■■ In the context of arrests (seizures of persons) the Fourth Amendment prefers warrants. See, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); and Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This preference falls short of the rule in the search context that without warrants searches are *per se* unreasonable, subject to a few exceptions. The standard for warrantless arrests amounts instead to a requirement that the arresting officer have probable cause. That standard is expressed in the following terms in Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964):

> "Whether [an arrest is] constitutionally valid depends * * * upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."

This rule is qualified by the preference which courts have for warrants.

■ There is an exception of sorts to the *Beck* requirement for warrantless arrests—the protective pat-down for weapons authorized in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It may be made on less than probable cause, but not without some reasonable justification.

Among those cases in which warrantless arrests have been upheld are Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); and Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed. 2d 782 (1967).

## FINDINGS BEARING UPON THE VARIOUS FACT SITUATIONS AND CASES

It becomes the duty of the court to appraise the conduct of the defendant law enforcement officers, in retrospect and for future guidance, on the facts of each of the cases, in view of the principles briefly described above. If the principles do not give crystal-clear answers under all fact situations it must be remembered that law enforcement, like judging, has to operate in a lot of gray areas, and that when the answer is unclear, our society, under our Constitution, puts a burden on him who would—or must—invade human freedoms to justify that invasion.

## FINDINGS BEARING SOLELY UPON THE WHEELER MOTIONS

### *Miss Arlys Stritzel*

On September 12, 1969, Miss Arlys Stritzel and a friend, Mrs. Reichard, registered at the Milner-Mecklenburg Hotel. About midnight or thereafter, Lt. Wade Stroud and several other members of the vice squad knocked on the ladies' door. When asked "Who's there?" the officers identified themselves as the police and threatened to knock the door down unless it was opened immediately. The occupants opened the door. Some of the officers entered, showed police identification, and looked around the room as though searching for other people. Objection to this procedure was voiced by Miss Stritzel and Mrs. Reichard. The police found no one and departed. The crime they had suspected was occupying a room for immoral purposes. Lt. Stroud testified that he and his men had no warrant, and that their "inquiry"—he denied that any officers had entered the

room—was based upon a call from an unknown person whom he *believed* to be an employee of the hotel, and whom he *believed* to be one who had on previous occasions given the police accurate information. The officers checked the guest register before going to the room, but Miss Stritzel's and Mrs. Reichard's names, as they appeared on the register, did not disclose that they were both women.

■ The "tip" of the anonymous informer, even when coupled with the lack of clear gender in the names on the hotel register, would have been insufficient to support the issuance of a search warrant. In fact, Lt. Stroud testified that he knew he couldn't establish probable cause to get a warrant. Clearly then, searching the room *without* a warrant was not justified.

### William D. Coleman

■ William D. Coleman was an employee of Radio Station WIST. By affidavit introduced in evidence, Coleman testified that on May 23, 1969, pursuant to a search warrant, his home was searched and he was arrested and charged with possession of marijuana. On June 19, 1969, the Mecklenburg County District Court conducted a hearing, found no probable cause for issuing the search warrant, and dismissed the prosecution.

The affidavit requesting the issuance of the search warrant was signed by L. R. Taylor and recited:

"I RECEIVED INFORMATION THAT WILLIAM DANIEL COLEMAN HAS IN HIS POSSESSION AND ON HIS PREMISES MARIHUANA DRUGS AND LSD ACID. I HAVE RECEIVED INFORMATION FROM THIS INFORMER IN THE PAST THAT HAS PROVED TO BE CORRECT BY LEADING TO CONVICTIONS AND I BELIEVE THIS INFORMATION TO BE CORRECT. THIS INFORMER HAS SEEN WHAT HE THOUGHT TO BE MARIHUANA AND LSD IN THE ABOVE SUBJECT'S APT WHICH IS APT 12F 2500 EASTWAY DR."

The informer, William D. Patterson, Jr., was a fellow-employee of Coleman's at WIST and also a member of the Charlotte City Police Reserve. Officer Taylor testified that Patterson had given the police information leading to two previous arrests and convictions. Patterson had visited the Coleman house with Mr. Garrett Allen, vice president of WIST, who was looking for a runaway child believed to be with Coleman. While there, Patterson observed pipes used for smoking marijuana and a small paper envelope of the type used to package LSD pills. He also testified he could smell the odor of burned marijuana in the house; he did not say he had seen unlawful drugs. Garrett Allen testified that Coleman later told him that he (Coleman) and a companion had used drugs in the house. All this information was available to Officer Taylor at the time the warrant to search Coleman's apartment was requested, but not all of it was included in the affidavit or otherwise presented under oath to the magistrate.

Assuming, without deciding, that Patterson's entry into Coleman's residence was constitutional, and assuming that probable cause to search the residence *could have been* established, still, the determination whether probable cause does exist for a search is to be made *by the magistrate upon consideration of information presented to him (under oath) at the time* and not on the basis of incomplete and conclusory allegations or later information. Aquilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Officer Taylor's affidavit recited none of the underlying circumstances surrounding his informant's identification of marijuana and LSD, and in fact said only that the informer had seen " * * * what he *thought to be* marijuana and LSD." It failed to establish that the informer was one qualified to identify either sub-

stance; and to say that "information received in the past from this informer has proved to be correct by leading to convictions" hardly gives a magistrate sufficient information on which to judge that informer's reliability.

This court agrees with the state court that the affidavit was insufficient and that the search warrant was improperly issued.

## FINDINGS IN MATIGIAN v. KELLY

### *The Genesis Club*

The Genesis Club at Matthews, North Carolina, was an incorporated club which opened to the public in December, 1969. It was operated by Jon Mullis, Marc Matigian, Katherine Sparrow and others. The club catered to the young. It had a public lobby, and a dance hall or auditorium with dim and bright lights. There were pillows on the floor for people to sit or lie on; and there were loud bands and other entertainment. Admission was charged. Patrons had the run of almost the entire establishment—both floors. No alcohol was served, and therefore there was no minimum age limit for patrons of the club.

The Genesis Club closed early in April, 1970, and is no longer in operation.

Starting on New Year's morning, January 1, 1970, around 3:00 or 4:00 a. m., county and city police made several uninvited visits to the Genesis Club. The evidence presented at the hearing showed that county police came there on January 1, January 11, and January 17, 1970, and that city police were there on January 10 (accompanied by one county police officer) and in late March of the same year.

On January 1, 1970, about 1:30 a. m., Mecklenburg County police arrested a young man walking in "confused fashion" down the middle of Highway 74 between Charlotte and Matthews. He was charged with public drunkenness. He told the policemen that he had taken LSD earlier in the evening at the Genesis Club. Two or three hours later Sgt.

Smith and two of his fellow officers went to the club and identified themselves as county policemen. They had no warrant. One officer stated that they were looking for drunks; another mentioned that they had picked up a young man on the road under the influence of LSD. The officers went into the auditorium, which was dimly lighted, observed people lying on the floor and flashed lights in their faces.

When the police returned to the lobby, there was some conversation, primarily between Sgt. Smith and Jon Mullis, about the use of drugs on the premises and about harboring runaways. Mullis denied that the Genesis Club was selling or condoning the consumption of drugs or that it was harboring runaways, or otherwise contributing to the delinquency of minors. He interpreted Smith's comments as a charge or suggestion that the proprietors of Genesis were encouraging crime if they failed to report persons seen or believed to be consuming drugs. (Sgt. Smith recalled the conversation as being sufficiently general that no implied threat should have been derived from it relating to policies of the Genesis Club on either drugs or stray children.) According to Mullis, Smith also hinted that Genesis might be a public nuisance and said that if the police thought it was, they could close it down, if they wanted to, by stationing squad cars down the road on both sides of the club and checking drivers' licenses. No such license check was ever set up.

The officers took from the club on this occasion several small water pistols. One officer said that such toys are dangerous because if one were pulled on him and he didn't get a good look at it, he would shoot first and ask questions later. The county officers also took a uniform coat which had been discarded by the Charlotte City police and which was lying on a piece of furniture at the club. Its ownership was not known immediately to those proprietors whom the officers questioned, but it was in fact the property of the Genesis Club clothing store. The coat was taken without any

knowledge by the officers of who or where its owner was.

Altogether this first visit lasted about thirty minutes.

About 11:30 on January 10, 1970, a warrantless search of the Genesis Club was conducted by the city-county vice squad, so designated because at that time it included Sgt. McGraw (since deceased) of the County Police. Several officers, perhaps eight or ten, came to the door of the club, and announced themselves to be the vice squad. They went throughout the building, picked up small objects from the floor, looked in closets and generally examined the premises. The visit was referred to in the testimony as a routine sort of inspection, and either in response to a question or in some other context, Lt. Stroud called it an "orientation session."

On January 11, 1970, at about 10:30 p. m., the County police with Sgt. Smith in charge, returned to the club, "just checking." They visited both floors of the building. Again there was no warrant and no evidence was introduced to show a reason for going into the club except that the police like occasionally to look into all places "that provide entertainment."

Three County police officers came to the club on January 17, 1970, in company with the stepfather of Karen Hodges, a fifteen-year-old girl. The stepfather and the officers entered the club, found the girl, and brought her out. The evidence was in conflict as to whether she was crying or not. The officers had no warrant and no other basis to support the search for Miss Hodges.

Near the end of March, 1970, Lt. Stroud and others of the city-county vice squad came to the club, showed warrants for the *arrest* of some people charged with drug violations, and searched the entire premises. The arrest warrants did not show that the persons were employed at or could be found at the Genesis Club, and there were no *search* warrants.

On none of these occasions did the police have a search warrant. On all occasions the club was searched—either in a roving, general way or with the objective of finding particular persons.

Admission fares were never demanded of the police and only occasional verbal resistance was ever offered to their entries. The court finds however that the proprietors did not consent to the searches or in any way knowingly waive constitutional rights, but instead simply acquiesced when identifiable police officers asserted the privilege to look around.

Isaac M. Clontz testified that he was working as an undercover agent for the United States and that he visited the Genesis Club several nights a week during January and February; that he bought drugs from "pushers" on the premises of the club or as a result of conversations commenced there; that he reported these facts to the vice squad; and that he twice went to Genesis Club with Lt. Stroud to identify suspects, including one employee of the Genesis Club. Clontz also said that he observed people at the club under the influence of drugs. As it relates to justification for the January visits of the police, however, this testimony would seem to have little relevance. According to Clontz, his first visit to the Genesis Club was on January 3, 1970. He testified that his first purchase of drugs there was on February 6, 1970, which was *after* all but one of the raids complained of; and that his first purchase of drugs from a person he identified as a club employee was not until February 20, 1970.

It thus appears that the information which Clontz supplied the police would not have been sufficient to procure warrants for the searches which were conducted of Genesis. In any event, no warrants were procured, and since none of the searches were authorized as exceptions to the basic requirement that searches be conducted with search warrants, they were therefore all unjustified and violative of the Fourth Amendment.

The visit on January 17, when County police arrived at the club in the company of the stepfather of Karen Hodges, was perhaps reasonable. The stepfather had reported to the police by telephone that Miss Hodges had run away from home. The police determined from their inquiries (presumably during the same telephone conversation) that when the girl left home she told her mother she was going to the Genesis Club. The stepfather, who was emotionally upset, then told the police that whether they helped him or not, he was going to Genesis to get his stepdaughter.

The stepfather entered Genesis without paying admission or without asking to go in just briefly to find his stepdaughter. He instead entered with the police, who according to Mullis said " * * * they were going in to get her and her father was with them." Mullis also testified as follows (lines 12 through 19, page 28 of transcript):

(Mr. Cobb, attorney for defendant)

Q. And they came with the father to see to it that there was no trouble in getting the girl to come home?

(Mullis, witness for plaintiff)

A. That was not explained to me. They mentioned that this was the father of the girl *and that they were going to look.* I said that I did not think the girl was there because I didn't know her, that I could not know all the patrons but if they wanted to go in, I think I mentioned why don't they send the father in and let him look.

None of this testimony was rebutted or otherwise undermined.

Furthermore, Sgt. Smith testified that after the incident at Genesis, Miss Hodges was " * * * brought to the Juvenile Bureau at the officers' request," indicating that the police also had an interest in finding the girl.

All of this suggests that the county officers participated in the search for Karen Hodges and that the search was as much conducted by the officers, with the stepfather accompanying them, as otherwise.

■ If the officers simply went with the stepfather to prevent disorder and to protect him and protect others from him, then what they did was a legitimate function of the police and a good example of intelligent police work. To the extent however that the police went to search for the girl or that the stepfather's entry into the club and subsequent search for his stepdaughter therein were made under claimed color of police authority, the search was unconstitutional for lack of a warrant.

Whether or not North Carolina General Statutes, Sections 110–44.1 and 110–44.4 are ultimately found to be constitutional—a question apparently raised by this case and now before a three-judge court—the warrant procedure provided for in those statutes was available to Miss Hodges' stepfather and to the police at the time this incident occurred.

■ It remains true that police officers may seize things obviously illegal and may arrest persons seen committing crimes, if those things or crimes are seen from a point where the officers have a lawful right to be. Ker v. California, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). It remains true that the police may make routine visits to public establishments—including places providing nighttime entertainment—for the purpose of inspecting and preserving order. However, unless criminal activity, or the means or fruits of crime, or contraband are observed from a lobby or public area; or unless there is an apparent breach of the peace, officers "just checking" and without paying admission are not justified in going beyond the entrance or foyer (public area) of a club or other establishment, when that club neither invites nor desires their presence. Unless they have a search warrant or unless a recognized exception to the requirement for a search warrant presents itself, the police are not authorized to conduct *search activities* of such a business even where they are justifiably in-

side it. Persons operating businesses, like persons occupying homes, can claim this much Fourth Amendment protection. See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); United States v. Raidl, 250 F.Supp. 278 (N.D. Ohio, 1965).

### *The Sparrow Home*

Katherine Sparrow was a proprietor of the Genesis Club. She testified about some of the searches which the police conducted there and also testified that twice in the autumn of 1969, city police officers came to her home on Myrtle Avenue looking for juveniles who had run away from their homes. On the first of these occasions the officers did not enter the house. The second time they came into the living room. The Sparrows did not know the persons about whom the police inquired. On neither occasion was the house searched. This testimony may bear on the question raised in Matigian regarding the North Carolina statutes on "harboring runaways."

## FINDINGS IN THE CASES OF HARRIS v. GOODMAN and STEELE v. GOODMAN.

*(The Search for Larry Thomas Miller)*

On December 29, 1969, two people were killed and some bystanders injured in a robbery at a grocery store on Beatties Ford Road in Charlotte. Larry Thomas Miller (otherwise known as Larry Jackson or Slim Jenkins) was a prime suspect.

Bernice Jackson Harris is Miller's mother. Walter Lee Booker and Miller are second or third cousins.

On the morning of December 30, 1969, around 1:00 or 2:00 a. m., police arrived at Walter Booker's apartment at 1216 Oaklawn Avenue. Mr. Booker saw them coming from an upstairs window and met them at the door. The police came into the apartment, but did not search it. Upon request, Booker identified photographs of Larry Miller, whom he had not seen in recent weeks.

Later that morning Booker called Mrs. Harris, who was in Florida, and told her that her son was in trouble and that it was serious. She came to Charlotte the same day by plane. After Mrs. Harris arrived in Charlotte she called the police to tell them she was in town and to tell them of her concern for her son and of her desire to cooperate in finding him. Two officers subsequently came to the Booker apartment, where Mrs. Harris was staying, to talk with her about Miller. This visit was during daylight hours.

On January 6, 1970, between midnight and daybreak, two plainclothes officers arrived at the Booker residence. They entered the apartment and asked Mrs. Harris a few questions in the presence of the Bookers. The apartment was not searched.

Between 2:00 and 3:00 p. m., again on January 6, 1970, Charlotte police arrived at the Booker residence *en masse*. Some were uniformed and some were in plainclothes, and they were armed with riot guns or sawed-off shotguns and with pistols. Some of them entered the apartment with weapons drawn and searched it upstairs and down, while others stationed themselves at each entrance. Miller was not in the apartment.

On none of these occasions did the police have a search warrant. Mrs. Booker requested one during the search but none was displayed. The police did have warrants for Miller's *arrest*, including one for interstate flight.

To support the search conducted the afternoon of January 6, the defendants offered testimony that they had received information from a confidential and reliable informer that Miller had entered the Booker apartment about 10:00 that morning and was still there. The defendants preferred not to disclose the informer's name and the court did not require that it be disclosed. The informer was reportedly watching the apartment from a location from which he could see both its entrances and all its windows. He was said to be able to recognize Miller

and to have kept the apartment under continuous observation from the time he supposedly saw Miller enter it until the raid, except for the times he tried to contact law enforcement officials. The informant had reportedly given the police reliable information which led to convictions on previous occasions. It was through the F.B.I., investigating pursuant to the interstate flight warrant, that the informant's information reached the city police. The raid at the Booker residence took place within minutes after the tip was received.

Larry Thomas Miller was reported to be armed and to have said he would never be captured alive.

James Gregory lived at 1613 Whisnant Avenue, Apartment 3. He had previously lived in a different apartment at 1620 Whisnant Avenue with Larry Miller. On December 22, 1969, a week before the robbery and murders at the grocery store on Beatties Ford Road, several members of the police department came to Gregory's apartment, knocked on the door, and when it was opened, entered with drawn guns. Gregory testified that the officers said "We're looking for killers," and that they inquired about Larry Miller and Clarence Steele. The apartment was searched, without a search warrant, and there was some minor roughing up of Jerry Menton who was with Gregory at the time.

A day or two later, on December 23 or 24, police officers returned and again searched the Gregory apartment with drawn guns and without a warrant.

On December 25, Gregory's apartment was searched in his absence by unknown persons. The only things missing were some Black Panther Christmas cards, a Black Panther wall poster, and a phone book cover on which were listed some names and telephone numbers.

On New Year's day, again in Gregory's absence, the apartment was searched by the police, again without a warrant, apparently in company with television photographers. It was left smelling of tear gas. Menton and Gregory first learned of this search by seeing it on television!

Warrantless searches of the James Steele residence on Double Oaks Road were made on December 17, 1969, and January 11, 1970. The defendants also testified or admitted in the pleadings that they searched other private houses without warrants in their efforts to find Steele and Miller.

The searches for Miller before December 29 and the search for Clarence Steele arose out of the investigation of previous armed robberies which they were suspected of committing. Miller alone is named in at least four arrest warrants for armed robbery—all dated before December 29. There was, however, no search for Miller as an alleged *killer* before the December 29, 1969 murders. The warrant for his arrest on the murder charge was not issued until December 29. Clarence Steele was never sought in connection with a murder.

 The legality of the daytime search of the Booker home is a close question, but the court is of the opinion that there was probable cause to make the search and that the search did satisfy Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) exception to the warrant requirement, as that exception is defined in Dorman v. United States, 435 F.2d 385 (D.C.Cir., 1970), and that the search was therefore not unreasonable.

 The searches of the homes of Gregory and Steele, however, were made without probable cause and were not justified as exceptions to the general search warrant requirement. Thus they were unreasonable and unlawful.

### FINDINGS IN THE CASE OF MRS. CORNELLIUS CUTHBERTSON HILL

In the late morning of August 18, 1969, Mrs. Cornellius Cuthbertson Hill, who was then a driver for the Charlotte Cab Company, parked her cab across the street from 1117 Oaklawn Avenue. She began walking south across Oaklawn toward "Mr. Fred's," a dilapidated frame building about sixteen feet by thirty feet

in size. According to Mrs. Hill, she reached the middle of the street, turned back to speak to an acquaintance, and was then seized from behind by a Charlotte city police officer and forced into "Mr. Fred's."

The police were in the process of raiding a "butter and eggs" lottery operation in which "Mr. Fred's" was the pick-up point. Runners delivered money and tickets there during a predetermined period of thirty minutes or less each day. The testimony of witnesses for the defendants indicated that Mrs. Hill entered the building on her own and was detained there as a suspected participant in the lottery operation. The police had no warrant for her arrest. Mrs. Hill denied any knowledge of a lottery. She was searched by a policewoman and no tickets or other gambling paraphernalia were found on her person. Mrs. Hill was taken to the police station along with those who were "caught with the goods." Many of these persons were charged with illegal gambling and subsequently convicted of that offense, but the magistrate found no probable cause for Mrs. Hill's arrest and she was released. Her pistol, for which she had a permit, was nevertheless retained by the police until she could establish her ownership of it. To do this, Mrs. Hill had to go to the K-Mart, where the weapon had been purchased, obtain a receipt showing that she was its purchaser, and return to the police station with that receipt.

Officer Rowland testified that he had observed the operation at Mr. Fred's every day for two weeks immediately preceding the August 18 raid. On each of these days, during the same twenty–thirty-minute period, a great many persons (twenty-two in one twenty-minute period) visited "Mr. Fred's." On four occasions, August 12–15, Mrs. Hill was among those who came. Rowland testified that he did not then know Mrs. Hill by name, but that he could recognize her and would not have been surprised to see her show up on the day of the raid.

■ Even if Mrs. Hill's own testimony is disregarded or disbelieved, her arrest without a warrant was nevertheless illegal, because it was made without probable cause. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court ruled that probable cause to arrest Terry and his companions did not exist, despite their highly suspicious conduct. Mere suspicious conduct it simply not probable cause. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Sibron v. New York, 392 U.S. 40, 88 S. Ct. 1889, 20 L.Ed.2d 917 (1968).

■ Furthermore (given the preference for arrest warrants), the police bypassed a judicial predetermination whether probable cause existed, in circumstances where to do so was unnecessary and not justified. If the police thought, on the basis of Officer Rowland's observations of Mrs. Hill, that there was probable cause to believe she was engaged in the operation of a lottery, then they had ample opportunity to seek a warrant for her arrest before the raid. Rowland testified that her arrival on the scene was not unexpected. That her name was not known would have been no impediment since she was of most conspicuous appearance and could have been described with particularity.

However far-fetched Mrs. Hill's colorful explanation of her conduct may be, it is not a relevant consideration in determining the constitutionality of her arrest.

"An arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964).

■ Since the arrest of Mrs. Hill was invalid, the search made of her person was also invalid. The validity of a search incident to arrest depends on the lawfulness of the arrest.

Any search which may have been conducted of her cab would have been illegal under any theory of justification.

 Since the police did arrest Mrs. Hill, albeit unlawfully, taking her pistol, which was in plain view, may have been reasonable. Retaining it, however, after the magistrate had ordered her released, was unjustified.

## FINDINGS IN THE CASE OF HIRAM KEMP HOLMES

Mr. Holmes was a desk clerk at the Clayton Hotel in Charlotte for a brief period in May of 1969. On the night of May 16, 1969, two Charlotte city police officers came into the hotel at about 11:00 o'clock, showed their badges to Holmes, and inquired "Who's in 222?" Holmes told them and they went upstairs and came down a few minutes later bringing with them the registered occupant of 222, Miss Frances Byrd (familiarly referred to as "Concord Frances") and another woman. On his way through the lobby one of the officers called to Holmes, "All right, pimp, let's go." Holmes requested an explanation and when he received none, he followed the officers obediently. He was taken to the police station, charged with soliciting for prostitution, and jailed for nearly twenty-four hours until he could put up bond. His case was *nol prossed* with leave when it was called for trial several weeks later.

Holmes testified that several times during his week or so as a desk clerk, Miss Byrd had left sealed envelopes with him, and that he had redelivered them to her unopened when she requested them. He said that he did not know that she was a prostitute, if she was, and he denied soliciting for prostitution.

The evidence which led to Holmes' arrest was supplied by one Ken Marshall, who testified that he had met Miss Byrd at a West Trade Street restaurant and that he had gone with her and another man and woman to her room, where he paid her $25. She gave the money to the bell hop "Woody" with instructions to take it to the desk clerk. Marshall then left and went to Independence Square a couple of blocks away where he had a policeman call the vice squad. He testified that he did not tell the officer why he wanted the vice squad. Marshall waited at the Square for members of the vice squad to arrive and then accompanied them to the hotel to identify the women for the arrests. His reason for proceeding as far as he did with the arrangement was that he had "tried to live a clean life for eight years."

There was no warrant for Holmes' arrest. Miss Byrd testified that the police brought with them a warrant for her arrest. (How the police were able to obtain a proper affidavit to support a warrant for Miss Byrd's arrest, and how they justified entering her room to await her return, are unknown.) Marshall saw no warrants for anybody.

 Whether the police on then known facts could have established, before a magistrate, probable cause to believe that Holmes was engaged in criminal activity, and could thereby have obtained a warrant for his arrest, is very doubtful. However, given the preference for warrants, the court is of the opinion that even if the police could have obtained a warrant, the warrantless arrest of Holmes was unconstitutional.

None of the unlawful conduct and warrantless searches described in this opinion produced convictions. Only in the *Coleman* incident was possible evidence of crime or fruits of crime discovered; and in that case the prosecution failed because (although a valid search warrant may have been obtainable) the officers did not take time to procure a valid warrant.

Interference by police with constitutional rights of citizens is not shown, on this record, to promote law and order—nor respect for law.

## CONCLUDING SUMMARY

Separate orders will be entered as follows:

1. In 2431, Wheeler, et al., v. Goodman, et al., portions of the previous gen-

eral restraints against the Charlotte city police will be continued in effect; the remaining relief sought will be denied.

2. In 2612, Matigian, et al., v. Kelly, et al., plaintiffs' personal property will be ordered returned to them; the temporary relief sought will be denied, in part because of mootness (*Genesis* is out of business and the individual plaintiffs are not shown to be engaged in similar business elsewhere) and in part because the issues will be decided in large part by a three-judge court which has been consti-tuted. This case will be tried ultimately before a jury but not until the three-judge court decision has been rendered.

3. In 2601, Harris, et al., v. Goodman, et al., and 2606, Steele, et al., v. Goodman, et al., orders will be entered denying any temporary relief especially based on these suits and ordering those cases for trial by jury on their issues of liability and damages.

4. No. 2569, Hill v. Rowland, et al., and No. 2637, Holmes v. Rowland, et al., will be scheduled for jury trial.

Exhibit "A"

Page 1

## CHECK-LIST FOR SEARCH WARRANT AFFIDAVITS

1. WHENEVER THE OFFICER USES A "CONFIDENTIAL, RE-LIABLE INFORMER" IN HIS AFFIDAVIT TO GET A SEARCH WARRANT, BE ABSOLUTELY POSITIVE THAT THE AFFI-DAVIT MEETS THE FOLLOWING REQUIREMENTS:

A. THE OFFICER MUST SET FORTH THE CIRCUMSTANCES BY WHICH THE INFORMANT CONCLUDES THAT THE ITEMS TO BE SEARCHED FOR ARE WHERE THE IN-FORMANT SAYS THEY ARE.

1. DATE—The informant must be placed at the scene at a recent time and the approximate period he was there must be included also. Example: "The informant was in the house during the week of June 14, 1969." Or, "the informant was on the premises during a two-week period from June 14 to June 28, 1969."

2. ITEMS TO BE SEARCHED FOR (example, narcotics)—

(a) The officer must state how or why the informant was able or qualified to identify the items as narcotics. Example: "This informant was able to identify the substance as marijuana (or heroin) because (the officer) showed and burned some marijuana in his presence on June 14, 1969." Or, "This informant was qualified to identify the substance as heroin because he has identified heroin previously in the following cases which led to the arrest and conviction of narcotic-law offenders." Here the officer should list previous cases, with approximate dates. It is suggested that the cases listed be as recent as possible.

(b) The affidavit must state *particularly* the items to be searched for. For example, "drugs", "stolen goods", or other such general descriptions are not enough. Describe as particularly as possible. If necessary examine the police officer to get more specific detail.

B. THE OFFICER MUST SET FORTH THE CIRCUMSTANCES FROM WHICH HE CONCLUDES THAT THE INFORMANT IS RELIABLE AND CREDIBLE.

1. The usual way to do this is to require the officer to list past cases where the informant has given information which led to the arrest and conviction of offenders. Example: "This informant has given information in the past to (the officer) which led to the arrest and conviction of offenders in the following cases: (List of cases, with approximate dates.)

2. If the informant has given no information in the past which led to arrest and conviction then the officer must set forth why he believes the informant to be reliable and credible in some other manner. Example: "This informant is a prominent member of the community of impeccable character who has approached us of his own volition with this information. After a thorough examination of this informant by (the officer) I am convinced that he has no reason or interest in giving false information, and that his credibility is beyond reproach."

2. A MAGISTRATE IS AN INDEPENDENT JUDICIAL OFFICER OF THE STATE OF NORTH CAROLINA, AND NOT IN ANY WAY REQUIRED TO ISSUE ANY AND EVERY SEARCH WARRANT FOR WHICH A POLICE OFFICER MIGHT APPLY. YOU SHOULD BE SATISFIED IN EVERY CASE THAT PROBABLE CAUSE EXISTS BEFORE ISSUING THE SEARCH WARRANT APPLIED FOR, AND SHOULD ROUTINELY EXAMINE THE POLICE OFFICER ABOUT THE BASIS FOR THE ALLEGATIONS OF THE WARRANT IN ORDER TO SATISFY YOUR OWN INDEPENDENT JUDGMENT THAT

(1) The facts alleged are true; and

(2) The facts alleged show probable cause.

Prepared by the Legal Advisor's Office
Charlotte Police Department
9–19–69