**UNITED STATES of America,**
**Plaintiff,**

v.

**Norbert Nisan KAHAN and Bertha Limo Newman, Defendants.**

**No. 71 CR. 1327.**

United States District Court,
S. D. New York.

Oct. 31, 1972.

Whitney North Seymour, Jr., U. S. Atty., by Robert P. Walton, Asst. U. S. Atty., New York City, for plaintiff.

Jesse Berman, New York City, for Kahan.

Joseph F. Minutolo, New York City, for Newman.

MOTLEY, District Judge.

## OPINION

Defendants, Norbert Nisan Kahan and Bertha Limo Newman, were indicted on November 30, 1971 in sixty-seven counts charging them with conspiracy and various substantive offenses relating to the submission and adjudication of certain applications by the Immigration and Naturalization Service of the United States [INS]. More specifically, Mrs. Newman was charged with making false statements on numerous applications which she submitted to the INS for extensions of stay on behalf of non-immigrant aliens. 18 U.S.C. § 1001. She was also charged with giving gratuities to Mr. Kahan, who was, at the time, an INS employee involved in adjudicating applications on behalf of aliens. 18 U.S.C. § 201(f). Mrs. Newman was alter-. natively charged with aiding and abetting these offenses. 18 U.S.C. § 2. Mr. Kahan was also charged under 18 U.S.C. § 1001 with making false statements on three INS documents and with accepting the money offered by Mrs. Newman for or because of his official duties. 18 U.S.C. § 201(g). In addition, Mr. Kahan was charged in two counts with perjury, which he allegedly committed on November 11, 1971 and again on November 15, 1971, by testifying falsely before a grand jury which was investigating these activities. 18 U.S.C. § 1623 (1970). During the course of the trial, two suppression motions, which should have been made before trial, were made by defense counsel. Despite the untimeliness of both motions, the court allowed a hearing on each and ruled on some from the bench. This opinion sets forth the reasons for the court's rulings on both motions.

*Decision on Motion to Suppress Evidence Obtained in Search of Defendant Kahan's Wastebasket*

Defendant Kahan moved to suppress a 3″ by 5″ piece of paper from a government-issued note pad and various pieces

of carbon paper and other components of government forms found in a wastebasket by a criminal investigator of the INS. At the time the evidence was discovered, the wastebasket was either beside or under defendant's desk and was reserved for his exclusive use. Defendant claims that the evidence in question was obtained by the government as the result of unconstitutional searches and seizures. The court agreed and, therefore, the challenged items were not admitted into evidence.

The items at issue were seized by the criminal investigator on May 17, 1971 and June 4, 1971 during the course of a search of the wastebasket. Searches of defendant's wastebasket had been made on every weekday from mid-March 1971 to June 4, 1971 and continued in like manner through November, 1971. On each day, the search was carried out in the late afternoon after the defendant had left the office for the day. The searches were conducted as part of a criminal investigation of defendant which had begun many months earlier. The express purpose of the investigation was to "determine whether he [Kahan] had unlawfully conspired with the defendant Newman to defraud the INS and to violate federal law in connection with the performance of his official duties." [Government's Memorandum of Law 2.] At no time did the government investigator obtain a search warrant to authorize any of the searches of defendant's wastebasket. However, the INS investigator did conduct the searches with the consent of defendant's supervisor in the office who was also involved in the investigation.

The issue for the court involved the resolution of three interrelated questions. The first question is whether the actions of the investigator, as described above, constituted "searches and seizures" within the meaning of the Fourth Amendment. *See* Terry v. Ohio, 392 U. S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Second, if they did, does defendant have standing to object to them? *See* Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Finally, if defendant can properly raise the Fourth Amendment issue, were the searches of the wastebasket and the seizure of the items, in the absence of a warrant, "unreasonable" by Fourth Amendment standards and, therefore, unconstitutional? *See* Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967).

■ Ordinarily, Fourth Amendment problems arise in the context of a search of the person or his property. In such situations, it is clear that the person, if he does not consent to the search or seizure, is protected by the Fourth Amendment. And the government must justify its search either on the ground that it was made pursuant to a valid search warrant or that it was within one of the specifically established and well-defined exceptions to the warrant requirement. *Katz, supra,* at 357, 88 S.Ct. 507.

■■ At times, however, there is the question whether a search has taken place at all, so that the person can claim Fourth Amendment protection. This question is often confused with the question of whether the circumstances of the search fall within one of the well-defined exceptions.[1] For example, "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz, supra,* at 351, 88 S.Ct. at 511. Similarly, where an officer is authorized to make an inventory of a person's property which is in police custody for the purpose of protecting the property, the officer may seize objects which are in plain view without violating the Fourth Amendment prohibition. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). *See* Coolidge v. New Hampshire, 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564

---

1. Compare the analysis of McMillan, J., in Wheeler v. Goodman, 330 F.Supp. 1356, 1361–1362 (W.D.N.C.1971).

(1971) (Stewart, J., plurality opinion) and cases cited therein. The Supreme Court has also held that no Fourth Amendment search takes place when a caseworker makes a home visit under the Aid to Dependent Children program in New York. Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971).

■ This court finds that, in the circumstances presented by this case, the activity of the government agent clearly constituted a Fourth Amendment search. The criminal investigator's express purpose in rummaging through the wastepaper basket was to obtain evidence which could be used to prove the defendant guilty of a crime. This case is thus in stark contrast to Wyman v. James, *supra*, at 317–318, 91 S.Ct. 381, where the Supreme Court's holding that no search had occurred turned precisely on the absence of "the traditional criminal law context." Nor is there any contention that the contents of the receptacle were in plain view and, therefore, within the exception carved out by the language in *Katz, supra.*

This is not a case where an office supervisor or fellow employee in a government office is looking for some needed document or record and inadvertently happens upon incriminating evidence in the desk or wastebasket of another employee. Nor is it a situation where a supervisor is inspecting the area used by a subordinate in order to examine his work or to evaluate his performance on the job. There is no doubt that the government should be able to manage its agencies and offices effectively and without undue restrictions on the supervision of its employees. What would be normal in the supervision and control of employees in a private business should be allowable in government offices as well. Thus, to assure efficiency and honesty, government supervisors have authority to oversee the work of their employees. However, when it comes to a specifically focused investigation of the suspected criminal activities of an employee in the course of his employment, it is obvious that the government, as employer, stands in a position much different from that of a private organization. If a private employer suspects misconduct on the part of an employee, he will not ordinarily conduct an investigation to substantiate criminal charges against him. Rather, he will simply fire that employee. If any private investigation of criminal conduct takes place at all, it will usually be for the purpose of retrieving the employer's property or correcting his accounts. In any event, the Fourth Amendment does not apply to such private action.

■ In contrast, when a government supervisor begins an investigation of suspected criminal activities of an employee in the course of his work, the supervisor's role is no longer that of a manager of an office, but that of a criminal investigator for the government. The purpose of the supervisor's surveillance is no longer simply to preserve efficiency in the office. It is specifically designed to prepare a criminal prosecution against the employee. In that case, searches and seizures by the supervisor or by other government agents are governed by the Fourth Amendment admonition that a warrant be obtained in the absence of exigent circumstances. There is no dispute that this type of ongoing criminal investigation of Mr. Kahan occurred in this case and, hence, the intrusion into his wastebasket must be considered a Fourth Amendment search.

■ However, the fact that a search did take place does not automatically give defendant standing to raise the Fourth Amendment issue. Jones v. United States, *supra*. A defendant can waive his Fourth Amendment rights by voluntarily consenting to a search of his person or property. No such consent was given in this case. Moreover, a defendant may lose his Fourth Amendment standing for other reasons as well, since the "capacity to claim the protection of the Amendment depends . . . upon whether the area [searched] was one in

which there was a reasonable expectation of freedom from governmental intrusion." Mancusi v. DeForte, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968); *Katz, supra.*

 In DeForte, the Court held that a union official had Fourth Amendment standing to object to a warrantless search of a union office which he shared with other union officials. *DeForte* would be controlling here on the issue of standing, if it were not for three distinguishing circumstances in this case. First, Mr. Kahan was working in a government office as opposed to a private office. Second, his supervisor in the office consented to the search of his wastepaper basket.[2] Third, the fact

that the evidence was obtained from a wastepaper basket raises certain additional problems.

 This court can see no distinction between a search of a government office specifically for the purpose of uncovering incriminating evidence and a similar search of a private office. Certainly, government employees have as much reason as private employees to expect that their desks and their wastebaskets will be free from the invasion of *criminal* investigators of the government. What a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz, supra,* at 351, 88 S.Ct. at 511. Perhaps it is even more true in

2. Whether to treat third-party consent as a bar to raising a Fourth Amendment claim or, as most courts do, as establishing the reasonableness of the search which is consented to is a difficult problem of Fourth Amendment theory. This court prefers the former approach for four reasons.

First, as De Forte, *supra*, points out, Fourth Amendment standing depends on people's reasonable expectations of privacy. Where third-party consent can be given, e. g., where two persons are sharing a room, it is arguable that the subject of the search can not have such an expectation, for he knows that the third party may invite anyone into the area which the subject later claims is protected.

Second, the third-party consent doctrine is an offshoot of the consent exception to the Fourth Amendment warrant requirement. The consent exception is based on the concept of waiver, which, in effect, says that by consenting to a search, a person relinquishes his right to object to its occurrence. [This is the conceptual basis, despite the fact that some courts have not extended the usual requirement for a valid waiver of constitutional rights (i. e., that the person know that he can assert the right) to a Fourth Amendment waiver by consent. See Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).] Since consent by the party himself destroys his Fourth Amendment standing, it is consistent to treat third-party consent in the same way.

Third, it is obvious that both direct consent and third-party consent may justify searches which would otherwise be ex-

tremely unreasonable, either because they are conducted on mere suspicion or less or because they are extensive and exploratory in nature. It is senseless to pretend that an otherwise unreasonable search is transformed into a reasonable one, when the subject of the search fails to assert his constitutional rights due to misapprehension or ignorance or when a third-party disregards the subject's interest in privacy.

Finally, in the interest of both theoretical clarity and protection of the warrant requirement, there should be a very limited number of justifications for warrantless searches and seizures. Indeed, the only exception to the warrant requirement should be for searches and seizures which are reasonable because they are the result of exigent circumstances which compel a government agent to act swiftly and which make the application for a warrant not "reasonably practicable." Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 at 758–60; Carroll v. United States, 267 U.S. 132, 156, 45 S.Ct. 280, 69 L.Ed. 543 (1925). See *Terry, supra*; Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). That is to say, once it is determined that the claimant was subjected to a search or seizure which intruded upon the privacy which he could reasonably expect under the circumstances, the government should be made to prove either that a valid warrant was obtained prior thereto or that exigent circumstances necessitated proceeding without a warrant.

the case of a wastebasket than of a desk that an employee expects that its contents will be left alone by others. Of course, this observation applies to government employees, as this court, its clerks, and secretaries will attest.

 The government contends that, since defendant was an INS employee, "his desk was subject to search without a warrant for evidence of criminal activity connected with his employment." [Memorandum at 3–4] United States v. Collins,[3] a Second Circuit Case, is relied upon in support of this proposition. The case is not on point. Although there was dicta in that decision which stated broadly that the search involved there "was a constitutional exercise of the power of the Government as defendant's employer, to supervise and investigate the performance of [the defendant's] duties as a Customs employee," the Court of Appeals for this Circuit hardly meant to imply that every office search in the course of investigating the work of a Customs employee would be immune from challenge by that employee. 349 F.2d at 868. Rather, the Court based its decision on the circumstances of that case and concluded that the search was "reasonable within the intendment of the Fourth Amendment."[4] *Id.* Indeed, the Court's analysis assumed *sub silentio* that the Customs employee did have standing to raise the Fourth Amendment claim. Furthermore, although *Collins* was a pre-*Katz* decision, it did implicitly recognize that

the determinative issue in passing on Fourth Amendment standing is not whether a given "area" is "constitutionally protected," but whether the claimant's reasonable expectation of privacy was encroached upon by the Government. *See DeForte* and *Katz, supra.* The crux of the *Collins* opinion was that "the authority of [the Customs and postal agents] to search the *public areas* of a government building in order to retrieve a mail package or its contents and to investigate their disappearance must be no less [than their broad authority to open incoming mail.]" 349 F.2d at 868. (Emphasis supplied.) The Court went on to note that defendant's work jacket, which was the object of the challenged search, was hung in "his supervisor's outer office, a *public area which was not shown to be segregated for private purposes* from the other work areas of the Mail Division." Moreover, the Court specifically reserved judgment on the question of whether the search would have been constitutional had it been of "a locker devoted to [defendant's] exclusive use." *Id.* at 868 n. 6.

 The concept of privacy is paramount in deciding a claimant's standing to invoke the protection of the Fourth Amendment. Courts should be hesitant to narrow that concept because, in this society, the sphere of personal privacy has become more and more confined. In a real sense, if courts begrudge the scope of the privacy expectations of the populace, not only will there be less and

---

3. 349 F.2d 863, 867–868 (2d Cir. 1965), cert. denied, 383 U.S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303 reh. denied, 384 U.S. 947, 86 S.Ct. 1469, 16 L.Ed.2d 545 (1966).

4. Some of the circumstances which justified the search were a) "the combined authority of Customs and postal agents to open incoming mail"; b) "the necessity of the Government to search for lost or stolen mail in a postal area or for lost or stolen property in a Customs facility"; and the fact that c) "defendant was handling valuable mail for which the Government was responsible." 349 F.2d at 868. The Government's suggestion that

8 U.S.C. § 1357(c), which relates only to persons "seeking admission to the United States," gives INS agents authority comparable to that exercised by the Customs and Postal agents in *Collins* is not well taken. As to points (b) and (c) above, the necessity for the search here was far smaller than in *Collins.* Finally, the amount of probable cause to search Collins' effects for the lost item was much greater there than here, witness the fact that it took the investigator here over two months to find the incriminating evidence he was hoping to discover. *See* United States v. Hagarty, 388 F.2d 713, 717 (7th Cir. 1968).

less freedom of the person, but his or her expectations of freedom will wither and with them the values of individuality and privacy from increasingly intrusive governmental control.

The *Collins* decision also pre-dated several significant Supreme Court cases involving the constitutional rights of governmental employees. The Supreme Court has asserted that "public employees are entitled, like all other persons, to the benefit of the Constitution. . . ." Uniformed Sanitation Men Association v. Commissioner, 392 U.S. 280, 284, 88 S.Ct. 1917, 1920, 20 L.Ed.2d 1089 (1968). *See* Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). While each of these cases involved the Fifth Amendment privilege against self-incrimination, they imply, if they do not mandate, that a public employee retains the shield of the Fourth Amendment while employed in a government office. *See* United States v. Hagarty, 388 F.2d 713, 717–718 (7th Cir. 1968). At the least, these cases make clear that the fact that defendant was employed in a government office does not distinguish his case from Mancusi v. DeForte for the purpose of Fourth Amendment standing.

In regard to the second characteristic of this case which distinguishes it from *DeForte,* consent to the search by defendant's INS supervisor, the court does not believe that the supervisor's consent in the situation presented here could bar defendant's challenge to the search. In *DeForte,* the Supreme Court remarked, in dicta, that "the Union or some of its officials might validly have consented to a search of the area *where the records were kept."* 392 U.S., at 369–370, 88 S.Ct., at 2124. (Emphasis supplied) This statement reflects the well-established principle that in some situations involving the joint ownership or control of property, one party in possession may validly consent to a governmental search and thereby negate the opportunity for objection to the search on Fourth Amendment grounds by another party against whom evidence is uncovered. *See, e. g.,* Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). However, the question in each case remains whether the defendant reasonably could have anticipated such consent by the third party or whether the defendant "must be taken to have assumed the risk that [the third party] would allow someone else to [search the property]. *Id.* at 740, 89 S.Ct. at 1425.

On this issue, the court believes that the "exclusive use" doctrine, as applied in United States v. Blok, 88 U.S.App.D. C. 326, 188 F.2d 1019 (1951), is dispositive.[5] As to the consent problem, *Blok* is on all fours with this case. In *Blok,* police searched defendant's desk in the government office where she was employed. Her supervisor consented to the search, but the Court of Appeals upheld her motion to suppress the evidence seized from her desk, stating:

"We think [Blok's] exclusive right to use the desk assigned to her made the search of it unreasonable." *Id.* at 1021.

The approach in *Blok* presaged the post-*Katz* emphasis on a defendant's reasonable expectation of privacy in evaluating the standing issue. Where

---

5. *See* United States ex rel. Cabey v. Mazurkiewicz, 431 F.2d 839, 843 n. 20 (3rd Cir. 1970): "It is fundamental that the doctrine which recognizes the validity of a third party's consent to a search must be applied guardedly to prevent erosion of the protection of the Fourth Amendment, since it makes no requirement of the existence of probable cause for the search and does not constitute an exception based on necessity. . . . Thus it has been held that one who has an equal right of control or possession of premises generally does not thereby have authority to consent to a search of an area on the premises which is set aside for the exclusive use of the other." *See* United States v. Poole, 307 F.Supp. 1185, 1188–1189 (E.D.La.1969).

an area in a government office is reserved for the exclusive use of a particular employee, that employee necessarily has a sufficient expectation of privacy in that area, whether it be a desk or wastebasket, so that a third-party consent to search by a criminal investigator of the government will be ineffective to bar the employee's Fourth Amendment claim in a subsequent prosecution.[6] *Cf. Collins, supra,* at 868 n. 6.

The third issue as to defendant's Fourth Amendment standing involves the contention of the government that Mr. Kahan lost his right to object to the search of his wastebasket when he "abandoned" the items seized by throwing them into the wastebasket. *See* Parman v. United States, 130 U.S.App. D.C. 188, 399 F.2d 559, 565 (1968), cert. denied, 393 U.S. 858, 89 S.Ct. 109, 21 L. Ed.2d 126 (1968). In *Parman,* Circuit Judge Burger, now the Chief Justice, stated: ". . . a valid finding of abandonment deprives Appellant of standing to assert a claim that the items of evidence in question were improperly 'seized.'" *Id.* The question for this court is whether the doctrine of abandonment properly applies to the facts of this case.

■■■■ As the quote above makes clear, the abandonment of property is a fact relevant to the determination of Fourth Amendment standing, not to the evaluation of the "reasonableness" of a warrantless search or seizure against which a defendant has a valid claim to Fourth Amendment protection. *See* Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), which is the source of the abandonment doctrine. This realization elucidates the theory underlying the abandonment principle. Simply formulated, the theory is that a person who abandons property no longer has "a reasonable expectation of freedom from governmental intrusion" into the area, or from governmental appropriation of the property, which was abandoned. *See DeForte, supra,* at 368, 88 S.Ct. at 2124; United States v. Bell, 457 F.2d 1231, 1239 (5th Cir. 1972); United States v. Cox, 428 F.2d 683, 688 (7th Cir. 1970), cert. denied, 400 U.S. 881, 91 S.Ct. 127, 27 L. Ed.2d 120 (1970); United States v. Cowan, 396 F.2d 83, 86–88 (2d Cir. 1968).

■■■■ In other words, the question is not whether there has been abandonment in the property law sense, *compare* Jones v. United States, 362 U.S. 257, 265–267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) with *Katz, supra,* at 351–352, 88 S.Ct. 507, but rather whether there has been abandonment of a reasonable expectation of privacy as to the area searched or the property seized. Thus, the Supreme Court has distinguished a situation where a person dropped a package on the floor of a taxicab from which he then alighted from situations involving property left in a vacated hotel room or in an open field. *See* Rios v. United States, 364 U.S. 253, 256, 262 n. 6, 80 S. Ct. 1431, 4 L.Ed.2d 1688 (1960).[7] Likewise, it has been held that a person does not give up his expectation of privacy with respect to letters and sealed packages when he deposits them in the mail. *See* United States v. Van Leeuwen, 397 U.S. 249, 251–252, 90 S.Ct. 1029, 25 L. Ed.2d 282 (1970).

■■■■ From this perspective, the flaw in the government's argument becomes

---

6. The court should point out, for the sake of clarity, that it relies on *Blok* for its teaching on the issue of third-party consent. The dicta in that opinion on the reasonableness of other types of searches · are not relevant to this case. *See* United States v. Hagarty, *supra,* at 718.

7. The search of a vacated hotel room was at issue in Abel v. United States, *supra.*

The "open field" doctrine dates from Hester v. United States, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924). Its appropriate scope after *Katz* is still not entirely clear. *Compare* United States v. Capps, 435 F.2d 637, 640–641, 641 n. 7 (9th Cir. 1970) *with* Wattenburg v. United States, 388 F.2d 853, 856–858 (9th Cir. 1968).

immediately apparent. When Mr. Kahan threw papers in his wastebasket, he did "abandon" them in the sense that he demonstrated an unequivocal intention to part with them forever. However, the undisputable expectation of an employee who discards items in his own wastebasket is that they subsequently will be disposed of and destroyed without prior inspection by others. In this respect, a wastebasket serves a similar function as the mails—the wastebasket is a vehicle for destroying objects;[8] a mailed package is a vehicle for sending them to someone else. In each case, the objects leave the possession of the person, but his expectation that the vehicle in which they have been placed will be free from *unreasonable* governmental searches remains the same.[9]

The decision of the Court of Appeals for this Circuit in United States v. Dzialak, 441 F.2d 212 (1971), cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971), relied on by the government, does not contradict this analysis in the least. *Dzialak* involved the issue of whether a *seizure* of items from a pile of trash in front of a defendant's house by a Railway Express agent violated the defendant's Fourth Amendment rights. There the trash had been left "between the sidewalk and street in front of appellant's home." *Id.* at 214. Moreover, the search was made by a private investigator, a Railway Express Agency employee. 441 F.2d at 214–215. Since there was no Fourth Amendment search, the defendant could hardly object to appropriation by the government of articles which he exposed to public view and were found by a private person. However, while searches of and seizures from a public trash receptacle have been treated by some courts as not conferring standing on an objecting defendant,[10] rummaging through open trash receptacles three feet from a defendant's back porch door, People v. Edwards, 71 Cal.2d 1096, 80 Cal.Rptr. 633, 458 P.2d 713, 718 (1969), or through an employee's wastebasket under his desk is a different matter entirely. *See* People v. Krivda, 5 Cal.3d 357, 96 Cal.Rptr. 62, 486 P.2d 1262, 1267–1269 (1971), cert. granted, 405 U.S. 1039, 92 S.Ct. 1307, 31 L.Ed.2d 579 (1972).

8. The court agrees with the defense counsel's analogy, offered in oral argument, that a wastebasket should be likened to a paper shredder in that whatever a person throws in it, he expects to be destroyed. Once destroyed, the contents and appearance of the papers disposed of are solely within the knowledge of that person and, hence, absolutely private.

9. In *Van Leeuwen, supra*, the Supreme Court cited its decision in Ex parte Jackson, 96 U.S. 727, 733, 24 L.Ed. 877 (1878) for the following proposition: "No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail. . . ." 397 U.S. at 251, 90 S.Ct. at 1031–1032. It is the reasonable expectation of privacy which forbids the opening of the mails by government agents without a warrant and absent exigent circumstances. The Fourth Amendment right does not depend on any statutes or regulations which create this expectation. Whether the government could validly promulgate a regulation authorizing searches of the desks and wastebaskets of government employees is questionable for this very reason. The issue, however, need not be reached in this case, for no such regulation has been cited by the government.

10. *See, e. g.*, United States v. Jackson, 448 F.2d 963, 971 (9th Cir. 1971), cert. denied, 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972), holding that there was a "surrender of privacy" with regard to articles placed by defendants in a public trash can outside their motel rooms; United States v. Stroble, 431 F.2d 1273, 1276 (6th Cir. 1970), where the challenged evidence was lying by the side of two garbage cans adjacent to the curb and was observed by a police officer who was on the public street; United States v. Minker, 312 F.2d 632, 634 (3rd Cir. 1962), reh. denied (1963), cert. denied, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed. 2d 978 (1963), involving a search made with the permission of a private trash collector of a commonly shared receptacle located outside the defendant's apartment building.

■■ Moreover, in this case, there is and can be no claim by the government that Mr. Kahan's *wastebasket* was "abandoned" by him when he left his office in the evening after work. So long as he remained an employee with an assigned desk under which lay a wastebasket for his exclusive use, whether he was actually in the office at any particular point in time could not possibly affect his expectation of privacy with respect to that receptacle.[11] Therefore, defendant Kahan clearly has Fourth Amendment standing to challenge the legality of the searches of his wastebasket which made the seizures possible.[12]

Having resolved the standing issue in favor of defendant, suppression of the evidence as requested follows inexorably. As the Supreme Court has most recently stated:

". . . there have been some exceptions to the warrant requirement. [Citing cases] But those exceptions are few in number and carefully delineated, *Katz, supra,* at 357; in general they serve the legitimate needs of law enforcement officers to protect their own well-being and preserve evidence from destruction. Even while carving out those exceptions, the Court has reaffirmed the principle that the 'police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure,' Terry v. Ohio, *supra,* 392 U.S. [1] at 20, 88 S.Ct. [1868] at 1879 [20 L.Ed.2d 889]; Chimel v. California,

*supra,* 395 U.S. [752] at 762, 89 S.Ct. [2034] at 2039 [23 L.Ed.2d 685]." United States v. United States District Court, 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752 (1972).

■ The INS criminal investigator searched defendant's wastebasket without a warrant on approximately forty consecutive working days before his May 17, 1971 warrantless search finally uncovered some incriminating evidence against Mr. Kahan. There was no special emergency situation on that day any more than there were exigent circumstances on any other day. Even the very first search without a warrant could not have been justified, since the government could simply have detained the wastebasket before it was emptied, so as to provide enough time to get a warrant. *See Van Leeuwen, supra.*

The search of the wastbasket on June 4, 1971 was likewise without a warrant and without other special justification. The government apparently recognizes that once it has been decided that Mr. Kahan has Fourth Amendment standing, under no view of the facts in this case were the searches "reasonable" without a warrant by Fourth Amendment standards, since it makes no argument on this ground.

The principles set forth in this decision should not hamstring the government's ability to deal with dishonest or unscrupulous employees. The government need not be able to prove the commission of a crime to justify the dismis-

11. The situation is analogous to that of the guest of a hotel or the tenant in an apartment house who is absent from his room at the time of the search. *See* Stoner v. California, 376 U.S. 483, 484, 489–490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); United States v. Robinson, 430 F.2d 1141, 1143 (6th Cir. 1970).

12. The government's effort to justify the search on the ground that "the articles thrown away . . . were government property," Brief 5, is not convincing. Davis v. United States, 328 U.S. 582, 589, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946), which is cited as authority for denying standing to defendant is ancient in rela-

tion to the subsequent evolution of Fourth Amendment law. In any event, *Davis* proves exactly the opposite proposition. The reason for denying Davis standing in that case was because he had consented to the search. 328 U.S. at 591–594. The fact that government coupons were involved only expanded "the permissible limits of persuasion" for obtaining consent to the search. *Id.* at 591. The Supreme Court expressly reserved judgment on the question "whether but for that consent the search and seizure incidental to the arrest were reasonable." *Id.* at 594. *See* Katz v. United States, 389 U.S. 347, 351–352, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

sal of an employee. Dismissal for cause is, itself, a potent sanction against employee misconduct.

■ Where the government believes that criminal prosecution of an employee is warranted, presumably it will have probable cause to believe that the employee has committed or is committing a crime. In that case, if it has probable cause to conduct a Fourth Amendment search or seizure to obtain evidence of crime, it can follow the warrant procedure. If, on the other hand, there is no probable cause to believe that the employee's conduct has been or will be unlawful, this court holds that the employee's right to privacy in the limited area of the office which is devoted to his *exclusive use* must be protected from intrusions by the investigative and prosecutory arms of government.

■ It is worth reiterating that this holding does not affect the ability of supervisors in government offices to search the desk or wastebasket of an employee for official documents or papers which are lost, missing, or needed for the business of the office or for evidence of a crime related to the employee's work where there is probable cause and circumstances necessitate an immediate search or seizure.

*Decision on Motion to Suppress
Eyewitness Identification*

Defendants Kahan and Newman also moved to suppress the proposed testimony of a criminal investigator with the INS who was expected to make an in-court identification of defendant Mrs. Newman. The proposed testimony was attacked as the product of an out-of-court identification conducted in violation of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U. S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

A hearing was held out of the presence of the jury. The court denied defendants' motion for the reasons set forth below.

Mrs. Newman was arrested on the evening of October 27, 1971 and taken before Magistrate Goettel. A form bearing the time, a docket number, the name of the Assistant United States Attorney, and a statement of the charge was signed by Magistrate Goettel. Mrs. Newman was released on her own recognizance. A preliminary hearing was set by the Magistrate for November 16, 1971.

A complaint was filed bearing the time of 6:10 P.M. and the date of October 28, 1971. It is unclear whether the date was a typographical error or whether the complaint was simply not typed and filed until the day after the appearance before the magistrate because of the lateness of the hour.

On the morning of October 28, 1971, Mrs. Newman was taken to the office of Mr. Horowitz, an Assistant United States Attorney. Standing with her in the office were Mr. Horowitz and two other men. Thomas Piccirillo, a criminal investigator with the INS, was sent to Mr. Horowitz's office by another INS investigator to see whether the woman standing in the office was the same woman he had observed during a surveillance of defendant Kahan some six months earlier. Mr. Piccirillo testified at the hearing that he went partially into the office, observed the side of the woman's face for at most four or five seconds and confirmed to the other investigator that this was the woman he had observed earlier. Mrs. Newman's counsel was not present at this identification nor is there any contention by the government that either she or her counsel was advised of her right to have counsel present. Mrs. Newman was not indicted until November 30, 1971.

■ In United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the Supreme Court held that courtroom identifications of an accused at trial must be excluded under the Sixth Amendment where the accused was exhibited to witnesses before trial

at a post-indictment lineup without notice to and in the absence of the accused's counsel, unless the government can establish "by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." *Wade, supra,* at 240, 87 S.Ct. at 1939.

In Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), a plurality of the Supreme Court indicated that the right to counsel at a lineup attaches not merely after an indictment has been issued but rather at the point when ". . . adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" —have commenced. *Id.* at 689, 92 S.Ct. at 1882. The Chief Justice, concurring, declared that ". . . the right to counsel attaches as soon as criminal charges are formally made against an accused and he becomes the subject of a 'criminal prosecution.'" *Id.* at 691, 92 S.Ct. at 1883. *See also* Saltys v. Adams, 465 F.2d 1023 (2d Cir. 1972).

 This court holds that both Mr. Kahan and Mrs. Newman have standing to challenge the constitutionality of Mrs. Newman's identification. While the *Wade* court held that the failure of the government to warn a defendant of his right to counsel at a post-indictment lineup violated his Sixth Amendment right to counsel, a right ordinarily quite personal, the underlying rationale of the rule was to prevent suggestive identification procedures. The presence of an attorney would ensure that there would be a witness present at the trial who could attack the credibility of a witness' courtroom identification. The *Wade* court noted that the basic right involved was the defendant's "right to a fair trial at which the witnesses against him might be meaningfully cross-examined." *Wade, supra,* at 224, 87 S.Ct. at 1930.

 Since Mr. Piccirillo's courtroom identification of Mrs. Newman was crucial evidence against Mr. Kahan, Mr. Kahan has standing to attack that identification as not having complied with the procedures required to promote reliable identifications. .

The court finds that formal judicial proceedings had been instituted against Mrs. Newman prior to the identification in Mr. Horowitz's office. It seems clear that, for all practical purposes, the adversary proceeding here had been initiated prior to the identification on October 28, 1971. The sheet which the magistrate signed the evening of October 27, 1971 included a statement of the statute Mrs. Newman was charged with violating. Moreover, Assistant United States Attorney Walton, now representing the government, said during oral argument that he believed that an attorney was appointed to represent her under the Criminal Justice Act, 18 U.S.C. § 3006A, on the evening of October 27. Mr. Walton conceded that it is normal practice to file the complaint at approximately the same time as the appearance before the magistrate. He stated: "It appears that due to the lateness of the hour they couldn't finish typing it that night." The right to counsel can hardly turn on the technicality of when the typing of the complaint was completed. Even if the complaint had not been filed prior to the identification, the process had been started which led inexorably to Mrs. Newman's being required to defend herself. Therefore, "adversary judicial criminal proceedings" had already commenced against Mrs. Newman when the one-woman show-up complained of here took place.[13]

 The government concedes that *Wade* is applicable to one-man show-ups as well as lineups. The identification in Mr. Horowitz's office was a one-man show-up since, while there were three men and a woman present, the witness was asked to identify the one woman.

13. In United States ex rel. Robinson v. Zelker, 468 F.2d 159 (2d Cir., decided September 28, 1972), announced after this court decided defendants' motion, the Second Circuit ruled that *Wade* applied after an arrest warrant was issued.

The *Wade* court indicated that the right to counsel would attach to both lineups and one-man show-ups: "The pretrial confrontation for purpose of identification may take the form of a lineup . . . or presentation of the suspect alone to the witness. . . . It is obvious that risks of suggestion attend either form of confrontation and increase the dangers inhering in eyewitness identification." *Id.* at 229, 87 S.Ct. at 1933.

Moreover, the Second Circuit has recognized that "one-man show-ups present obvious dangers. . . ." United States ex rel. Frasier v. Henderson, 464 F.2d 260 (2d Cir. 1972). The considerations which require the presence of counsel at lineups are at least as applicable to show-ups.[14]

This court holds that Wade applies to all witnesses who offer in-court identification testimony and not just to victim witnesses. The government argued that *Wade* is applicable only to identifications involving witnesses who were victims and not to experienced, trained government agents. The government offered no authority for this proposition.[15]

The *Wade* court expressed concern with the dangers inherent in lineups or show-ups involving *any* witnesses: "[T]he confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *Wade, supra* at 228, 87 S.Ct. at 1933. In *Gilbert, supra,* the Court held identification testimony of non-victim eyewitnesses inadmissible under *Wade.*

As for the contention that trained government investigators are so reliable that the Wade protections are unnecessary, the *Wade* court held that an attorney should be present at an identifica-

tion session because of the need for witnesses who can testify to what transpired at the identification session. The Court declared that "[t]he impediments to an objective observation are increased when the victim is the witness." 388 U.S. at 230, 87 S.Ct. at 1934. However, the Court in noting that defense counsel who was not present at a lineup can seldom reconstruct the manner and mode of lineup identification for judge or jury at trial, observed that "[t]hose participating in a lineup with the accused may often be police officers. . . ." *Id.* Government agents, in short, may not be willing to offer the defense much assistance in determining what actually occurred at an identification session.

■■■ While it may well be that an agent who has observed the defendant over a long period of time will be less influenced by an improper lineup or show-up than would the ordinary witness, under *Wade,* this can be considered on the issue of whether the lineup or show-up tainted the in-court identification.

■■■ Despite the government's failure to conduct the one-woman show-up in accordance with the requirements of *Wade* and *Gilbert,* Mr. Piccirillo's in-court identification testimony is admissible since it had a source independent of the improper show-up procedure. Under *Wade,* among the factors to be considered in determining whether a lineup or show-up has tainted the in-court identification are the following: "the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act

---

14. *See also Robinson, supra,* note 13.

15. The applicability of Wade to identifications by police officers has been con-

firmed by the Second Circuit in *Robinson, supra,* note 13.

and the lineup identification." *Id*. at 241, 87 S.Ct. at 1940.

Investigator Piccirillo had been observing defendant Kahan from the beginning of April, 1971 until May 13, 1971 and kept a notebook in which he recorded his observations, (Government's Exhibit 37). On approximately April 8, 1971, another investigator showed him a bust photograph of Mrs. Bertha Newman. On April 13, 1971 and April 19, 1971, Mr. Piccirillo made entries in his notebook describing meetings between Mr. Kahan and a woman. The woman's description closely fits Mrs. Newman. In his entry for April 13, 1971 he wrote in part:

> N. K. [Kahan] left office alone, walked north on West Broadway. Just before Warren Street on East side of West Broadway N. K. bunked into a short woman and next thing I knew they were talking. . . Woman had a wet look coat brownish marron, red dyed hair. She came to N. K. shoulder in ht.

In his entry for April 19, 1971, Mr. Piccirillo described a woman who appeared alongside Mr. Kahan after Mr. Kahan had come out of the INS. He had originally written that the woman "could be" the same woman he had seen on April 13, but by his testimony, changed the entry the same day to read that she "was the woman" he had seen previously. He described the woman as follows:

> She was short came to just below N. K. shoulders black hair with a reddish tint more black than red. Stocky, plump or dumpy. Light complexion. Hair was long *but* not up to shoulders in a partial pony tail.

There is no significant discrepancy between these two entries. While in the entry for April 13, the woman's hair is described as "red dyed," and in the entry for April 19, her hair is said to be "more black than red," it is not surprising that hair which was "more black than red" might be described as "red dyed." Mr. Piccirillo had an adequate opportunity to observe Mrs. Newman on both occasions. On April 13, according to his testimony, he observed the defendants, who were standing a few feet from him outdoors, and "it was light out," although it was around 5:00 P.M. He testified that on April 19, he observed them from "three or four feet" and the sun was shining.

While Mr. Piccirillo at the time could not identify the woman as Mrs. Newman —in his notes he referred to her twice as an "unknown woman"—he had previously observed only a bust photograph which neither closely represented Mrs. Newman's hair style in April, 1971 nor indicated her unusually small stature.

Each of the observations of the woman on April 13, 1971 and April 19, 1971 lasted several minutes. By contrast, the show-up in Mr. Horowitz's office lasted only a few seconds.

While the show-up occurred approximately six months after the street observations, it is very doubtful that the show-up would be significantly fresher in the witness' mind than the prior identifications since the show-up occurred approximately eleven months before the in-court identification.