UNITED STATES of America,
Plaintiff-Appellee,

v.

Brendan J. HAGARTY, Defendant-
Appellant.

No. 15881.

United States Court of Appeals
Seventh Circuit.

Jan. 11, 1968.

Rehearing Denied March 13, 1968.

Harvey M. Silets, Chicago, Ill., for appellant. Terence J. Moore, Chicago, Ill., Glenn R. Graves, Washington, D. C., Amicus Curiæ. Harris, Burman & Silets, Chicago, Ill., of counsel.

Edward V. Hanrahan, U. S. Atty., Richard G. Schultz, Asst. U. S. Atty., Chicago, Ill., for appellee. John Peter Lulinski, Gerald M. Werksman, Asst. U. S. Attys., of counsel.

Before HASTINGS, Chief Judge, and KILEY and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

After a jury trial, defendant Brendan J. Hagarty was convicted of perjury under Section 1621 of the Criminal Code (18 U.S.C. § 1621). Hagarty, a former Chicago police officer, was a criminal investigator for the Internal Revenue Service.

In March 1962, IRS Special Agent Arthur Ontko was assigned to the criminal tax investigation of former Chicago police captain Frank Pape. The next month, Ontko contacted Hagarty to see if he had any information about Mr. Pape, but Hagarty said not.

In March 1962, Victor Weber of the Inspection Service of the Internal Revenue Service commenced an unrelated investigation of Arthur Nasser, a trial attorney employed by the IRS Regional Counsel's office in Chicago. Hagarty knew Nasser. Electronic eavesdropping on Nasser's office conversations commenced in June 1962 and continued through early February 1963.

In January 1963, Inspector Weber and Inspector John T. Kelly installed an eavesdropping device in the baseboard of the wall of Nasser's government office. This consisted of a miniature microphone, a radio transmitter and a power pack. This device carried the conversations in Nasser's office to a receiver in the Regional Inspector's office ten floors below. This eavesdropping was designed to aid the Nasser investigation. No investigation of Hagarty was then authorized.

On the morning of January 28, IRS Inspector Richard G. Moylan was monitoring the receiving unit and heard Nasser telephone Hagarty to arrange a meeting between them in Nasser's office that evening after 5:00 p. m. Nasser told Hagarty to turn left and walk straight back to Nasser's office, thus avoiding the receptionist. Without obtaining a search warrant, Weber intended to intercept and tape-record Hagarty's voice when he arrived at Nasser's office. Neither Hagarty nor Nasser had consented to the eavesdropping.

When Hagarty arrived at Nasser's office at 5:15 p. m. that evening, Inspectors Weber, Moylan and Kelly, through the listening device, heard Nasser and Hagarty discussing the criminal tax fraud investigation of Frank Pape. Although some of the conversation was too inaudible to record, the transcript of the tape shows that Hagarty and Nasser were discussing taxpayer's strategy in that criminal investigation. In their conversation, Nasser referred to Special Agent Arthur Ontko, and Nasser mentioned that he planned to phone Ontko the next day about the Pape case. At the close of the conversation, Hagarty telephoned his home to say that he would be late for dinner.

On January 29, Moylan overheard Nasser telephoning Inspector Ontko, but Nasser was unable to reach him.

From February 5, 1963, to March 13, 1963, Hagarty was assigned to the Organized Crime Division of the Internal Revenue Service, attached to its wagering tax group. On March 7, Hagarty asked Ontko the status of the Frank Pape case, whether it was a good case, and whether it was assigned to the Organized Crime Division. Ontko replied that it was the best case on which he had worked, that he was preparing schedules for it, and that the case was assigned to the Organized Crime Division. However, the investigative file of the Pape case was never inspected by Nasser or Hagarty.

In September 1963, the Internal Revenue Service commenced a year-long in-

vestigation of Hagarty. Nothing incriminatory was discovered about Hagarty during this period.

On September 29, 1964, in Inspector Farmer's presence,[1] Ontko interviewed Hagarty who was placed under oath and advised of his Fifth Amendment rights. Ontko asked Hagarty whether he had ever been to Nasser's office, and Hagarty replied, "Not that he could recall." Hagarty also stated that he did not discuss the Pape investigation with Nasser. Hagarty gave Ontko an unsworn written statement to that effect. Afterwards, the tape recording of the Nasser-Hagarty conversation was played two or three times, but Hagarty denied that it refreshed his recollection. Hagarty refused to furnish Ontko with a taped voice exemplar. The next day Hagarty refused to give Ontko a sworn written statement after being reminded of his Fifth Amendment rights. Although the tape recording of the January 28 conversation between Nasser and Hagarty was replayed several times again, Hagarty's memory was not refreshed, and he commented that the voice was not his. At the second interview, he also refused a voice exemplar. Farmer was also present at the September 30 interview.

In December 1964, Hagarty was having coffee with Special Agent Golla and other agents. On this occasion, Hagarty remarked that the way to avoid cooperating with the IRS Inspection Service in a matter which might implicate you is to state that you do not remember.

On December 23, 1964, the District Director of Internal Revenue wrote Hagarty that his interview with Ontko had been unsatisfactory and that Hagarty should appear for another interview under oath. This transcribed interview was conducted by Inspector Weber on January 6, 1965, with Hagarty being sworn and again advised of his Fifth Amendment rights but not advised that the interview was being tape-recorded. At this interview, attended also by In-

spector Kelly and court reporter Miss Rimland, Hagarty stated that he did not recall the Nasser meeting of January 28, nor at first did he recall asking Arthur Ontko on March 7 about the status of the Frank Pape case. Shortly thereafter Hagarty categorically denied making such an inquiry of Ontko. Although Inspector Weber repeatedly played portions of an improved recording of the January 28 conversation between Hagarty and Nasser, Hagarty's memory was assertedly not refreshed, and he refused still again to give a voice exemplar.

On January 22, Hagarty returned to the Regional Inspector's office to review, correct and sign the transcript of the December 23 interview. He refused to sign it unless given permission to take it home over the weekend. Inspector Weber advised Hagarty that this would violate the policy of the Inspection Service, but he offered to let Hagarty review the transcript there. This offer was declined and Hagarty left without signing the transcript.

On February 18, 1965, Hagarty was indicted for testifying falsely before Inspector Weber on January 6th. Seven falsehoods were specified in the one-count indictment.

At the trial, Ontko testified that on March 7, 1963, Hagarty came up to him and asked about the status of the Pape case. The rest of the Government's case depended upon matters revealed in the recorded Hagarty-Nasser conversation of January 28.

Concededly, only one of the seven charges in the one-count indictment could be proved without the benefit of the recordings of the January 28, 1963, conversation between Hagarty and Nasser. That particular charge was "Hagarty testified in substance that he did not recall asking Ontko about the status of the Frank Pape case prior to September of 1964." Since Hagarty did not take the stand, Ontko was the only witness of the alleged March 7, 1963,

---

1. Farmer may have stepped out for a time during the September 29 interview. Inspector Plath was present for a portion of the September 29 or 30 interview.

conversation in which Hagarty asked about the Pape case. Under the rule governing perjury prosecutions, falsity must usually be established by two independent witnesses or by one witness and corroborating circumstances. Weiler v. United States, 323 U.S. 606, 610, 65 S.Ct. 548, 89 L.Ed. 495; Hammer v. United States, 271 U.S. 620, 626, 46 S. Ct. 603, 70 L.Ed. 1118.[2] At the oral argument, the Government conceded that this rule was not satisfied with respect to the March 7 Hagarty-Ontko encounter. Accordingly, the crucial question is whether the evidence of the January 28 Hagarty-Nasser conversation obtained by eavesdropping without a search warrant and without judicial sanction, is banned by the Fourth Amendment.

In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, the Supreme Court reversed a conviction where the Government had introduced evidence of the defendant's telephone conversations overheard by FBI agents through a device they had attached to the outside of a public telephone booth. There too, no search warrant had been obtained, nor had the surveillance been judicially authorized as in Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394. In the absence of a warrant or appropriate judicial order, the surveillance was held to be *"per se* unreasonable under the Fourth Amendment," even though the FBI investigation of Katz's activities established "a strong probability" that he was violating federal law. 389 U.S. at

pgs. 354, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. No probable cause is espoused here.

■ The present appeal was argued before *Katz* was decided, but most of the Government's arguments have been foreclosed by that opinion. Thus the Government first urges that Nasser's government office was not a constitutionally protected area. A similar argument with respect to the public telephone booth was rejected in *Katz*, where Mr. Justice Stewart pointed out that "the Fourth Amendment protects people, not places," and that what a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." The key is whether defendant sought to exclude "the uninvited ear." Under this rationale, it is immaterial that the overheard conversation took place in an IRS office. The Fourth Amendment applies "Wherever a man may be * * *." 389 U.S. at pp. 351–352, 359, 88 S.Ct. 507, 19 L.Ed.2d 576.[3]

■ The Government also urges that Hagarty has no standing to adopt vicariously Nasser's Fourth Amendment rights. To support this argument, the Government points out that the eavesdropping was conducted as part of the investigation of Nasser and involved his office. A similar argument was rejected in Berger v. State of New York, 388 U. S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040, where Berger's conversation was overheard by an electronic device in the of-

---

**2.** In perjury cases, there are two essential elements of proof. First, the statements made by the defendant must be proven false. Second, it must be proved that the defendant did not believe those statements to be true. The two-witness (or one-witness and corroborative circumstances) rule applies to proof of the first element, but the defendant's belief that the statements were not true can be proved by circumstantial evidence. United States v. Magin, 280 F.2d 74, 76–78 (7th Cir. 1960), certiorari denied, 364 U.S. 914, 81 S.Ct. 271, 5 L.Ed.2d 228. Where the indictment alleges that a defendant's testimony that he did not remember certain interviews was false, and that he did not believe such testimony was true, both elements of the perjury offense involve

his state of mind, and the charge is susceptible of proof by circumstantial evidence of guilt beyond a reasonable doubt. United States v. Nicoletti, 310 F.2d 359, 362–363 (7th Cir. 1963), certiorari denied, 372 U.S. 942, 83 S.Ct. 935, 9 L.Ed.2d 968.

**3.** Katz refused to translate the Fourth Amendment into a general constitutional right to privacy, stating that the protection of a person's general right to privacy is left largely to the law of the States. (389 U.S. at pgs. 350–351). For a thoughful essay championing the protection of the "core of privacy," subject to law enforcement needs, see Judge Kiley's "Privacy's Last Stand," 26 The Critic 41 (1967).

fice of Harry Steinman, apparently as part of an investigation of Steinman. There the Court observed (at p. 55, 87 S.Ct. at p. 1882):

> " * * * petitioner clearly has standing to challenge the statute [permitting judicially approved eavesdropping], being indisputably affected by it * * *." 4

The fact that the conversation was held after hours and was not about legitimate government business does not alter the situation. Since the possessor of a stolen car has standing to object to its search (United States v. Nikrasch, 367 F.2d 740 (7th Cir. 1966)), Hagarty certainly has standing to challenge the "bugging" of an office when he was present there at the invitation of its usual occupant.

▋ The Government contends that there was no Fourth Amendment violation because the physical intrusion of this device in the IRS office involved no trespass. The trespass and physical intrusion doctrines were rejected in *Katz*, where the Court observed (389 U.S. at p. 353, 88 S.Ct. at 512):

> "We conclude that the * * * 'trespass' doctrine * * * can no longer be regarded as controlling. * * * The fact that the electronic device employed * * * did not happen to penetrate the wall of the [telephone] booth can have no constitutional significance."

▋ Finally, relying upon United States v. Collins, 349 F.2d 863 (2d Cir. 1965), certiorari denied 383 U.S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303, United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019 (1951), and Uniformed Sanitation Men Association, Inc, v. Commissioner of Sanitation, 383 F.2d 364 (2d Cir. 1967), certiorari granted, 390 U.S. 919, 88 S.Ct. 851, 19 L.Ed.2d 979, the Government urges that the Fourth Amendment does not apply to the search of government premises in the course of an investigation relating to the conduct of governmental business. In *Collins*,

customs agents searched defendant's work jacket as it hung on a rack in his supervisor's outer office in the United States Customs House in New York City. They were attempting to locate six emeralds taken from the Customs Mail Division earlier that same day. In upholding the search of the jacket in this Customs Service clerk, the Court noted that the search "was a constitutional exercise of the power of the Government as defendant's employer, to supervise and investigate the performance of his duties as a Customs employee" (349 F.2d at p. 868). It added (*ibid*):

> "The combined authority of Customs and postal agents to open incoming mail is extremely broad by reason of both statute and regulations. * * * The authority of these agents to search the public areas of a government building in order to retrieve a mail package or its contents and to investigate their disappearance must be no less. The room in which defendant's work jacket was hung was his supervisor's outer office, a public area which was not shown to be segregated for private purposes from the other work areas of the Mail Division."

In *Collins*, the Court observed that the authority of the agents to make the search was akin to their authority to open incoming mail. Of course, no such authority is present here. There the search was arguably made in an effort to supervise and investigate Collins' duties. Here the eavesdropping had no such purpose as to Hagarty but was designed to detect criminal activity of Nasser. Also in *Collins*, the Court considered it important that the search was in a public area; it refused to decide the constitutionality of a search of defendant's locker. In *Collins* too, the search took place on the very day of the disappearance of the emeralds; fast action was essential to thwart the theft. In contrast, McDonald v. United States, 335 U.S. 451, 454, 69 S.Ct. 191, 93 L.Ed. 153,

---

4. See also Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697; United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59.

teaches that where officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search warrant. Here the warrantless eavesdropping of Nasser's conversations commenced in June 1962. Surely, if probable cause were demonstrated, there was ample opportunity between then and January 28, 1963, to seek a search warrant or judicial authorization for appropriately circumscribed surveillance before the critical conversation occurred between Nasser and Hagarty. No compelling reasons have been advanced to justify the absence of a search warrant or judicial approval of the "bug."

In *Blok,* the police searched defendant's desk in the government office where she was employed. Her supervisor consented to the search, but the Court of Appeals upheld her motion to suppress the evidence seized from her desk. We approve of and follow that holding and do not consider as controlling the *Blok* dicta upon which the Government relies. Thus Judge Edgerton said that Peggy Jean Blok's "official superiors might reasonably have searched the desk for official property needed for official use." He added that her supervisors could not reasonably search her desk for anything "that did not belong to the government and had no connection with the work of the office." 188 F.2d at p. 1021. Here there was no search for "official property needed for official use" or for anything belonging to the Government. As in *Blok,* this eavesdropping was part of an effort to secure evidence of crime, here Nasser's. " 'It was precisely the kind of search by policemen [here IRS agents] for evidence of crime against which the constitutional prohibition was directed.' * * Operation of a government agency and enforcement of criminal law do not

amalgamate to give a right of search beyond the scope of either." *Ibid.*

The *Uniformed Sanitation Men's* case is distinguishable as not involving a criminal prosecution. For various reasons, the 16 appellants, employees of the Department of Sanitation of the City of New York, had only been suspended. This is quite a different matter from using evidence obtained by unauthorized eavesdropping in a subsequent criminal proceeding. See Spevack v. Klein, 385 U.S. 511, 519–520, 87 S.Ct. 625, 17 L.Ed.2d 574, concurring opinion of Mr. Justice Fortas. Furthermore, in holding that the wiretapping in *Uniformed Sanitation Men's* did not deprive the municipal employees of Fourth Amendment rights, the Court stressed "there was no invasion of appellants' right of privacy since the telephone was not a private telephone nor did it belong to appellants" (383 F.2d at p. 369). As seen, that rationale was discarded by the Supreme Court in its recent *Katz* opinion.

Although the Government defends the surveillance of January 28, 1963, the Attorney General issued regulations in June 1967 prohibiting surveillance of this type, unless with consent of both parties to the conversation, except with advance approval of the Attorney General.[5] The prohibitions in these regulations do not extend to national security cases. Congress is considering legislation allowing "bugging" under court permission where designated serious crimes are being investigated. Here neither the Attorney General's advance approval nor court permission had been obtained. The national security was of course not involved.[6] The surveillance was therefore out of harmony with present-day enforcement procedures.

■ Although the defendant raises other supposed errors, it is unnecessary

---

5. In emergencies, his advance approval is not required. See New York Times of July 7, 1967, p. 16. Insofar as the regulations apply only to "constitutionally protected areas," they have been superseded by *Katz.*

6. In the *Katz* case, the Supreme Court left open the question as to what safeguards would satisfy the Fourth Amendment in surveillance involving the national security (389 U.S. at p. 358, 88 S.Ct. at 507).

to consider them in view of our holding that the Fourth Amendment prohibited the receipt of the evidence obtained through the electronic listening device. In closing, it should be observed that the District Court's evidentiary rulings occurred before *Katz* repudiated Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, the leading cases in the Government's arsenal at the time of this trial. Nothing in *Katz* supports the carving out of an exception to the Fourth Amendment's requirements in the circumstances of this case.

Reversed.