**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Arthur NASSER, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Richard W. HAUFF, Defendant-Appellant.**

**Nos. 18600, 18601.**

United States Court of Appeals,
Seventh Circuit.

March 5, 1973.

As Modified on Denial of Rehearing
April 16, 1973.

Maurice J. Walsh, Sherman C. Magidson, Terence Mac Carthy, Federal Defender Program, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Robert A. Filpi, and William T. Huyck, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, STEVENS and SPRECHER, Circuit Judges.

FAIRCHILD, Circuit Judge.

Appellant Arthur Nasser is an attorney, and between September, 1955 and May, 1963, he was employed by the U. S. Internal Revenue Service. He served first in the enforcement division and later in the Tax Court division of the office of regional counsel.

In December, 1965, he was indicted for violations, after leaving government service, of a conflict of interest statute,[1]

---

1. 18 U.S.C. § 207(a) (1964) provides,

"Whoever, having been an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, . . . after his employment has ceased, knowingly acts as agent or attorney for anyone other than the United States in connection with any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter involving a specific party or parties in which the United States is a party or has a direct and substantial interest and in which he participated personally and substantially as an officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, while so employed, . . .

"Shall be fined not more than $10,000 or imprisoned for not more than two years, or both . . . ."

and Nasser and Richard Hauff (not a federal employee) were indicted for conspiracy to cause violation of the same statute.

Count I charged that from December, 1963 until August, 1964, Nasser knowingly acted as attorney for August Circella in connection with an investigation of the 1958 and 1959 federal income tax liability of Circella, a matter in which Nasser had participated personally and substantially as an employee of IRS. The jury failed to agree on this count, and it was then dismissed, on motion of the government.

Count II was a similar charge involving the collection of Hauff's 1958 liability, and Count III a similar charge involving an investigation of Hauff's 1959 liability. The jury found Nasser guilty of both counts.

Count IV charged that beginning in December, 1963 Nasser, Hauff, and Circella conspired knowingly to have Nasser act as attorney for Hauff and Circella (not a defendant) in matters in which Nasser had participated personally and substantially as an employee of IRS. The jury found both Nasser and Hauff guilty on this count.

### I. *Claims that the Statute is Unconstitutional, at least as applied to Nasser.*

#### A. *Vagueness.*

Appellants argue that § 207(a) violates the due process clause of the fifth amendment because of vagueness in that the employee must decide at his own risk (1) whether he participated "substantially" in a matter while he was employed; and (2) whether the mode of participation is encompassed by the words "or otherwise."

■ We believe that the language of the statute is sufficiently definite to permit a fact finder to decide on the basis of the evidence whether defendant's participation fell within the proscribed conduct. Avoiding conflicts of interest is a traditional ethic of the legal profession. The standards are matters of common understanding and practice among attorneys. This statute proscribes perhaps as precisely as possible an unethical practice that can manifest itself in infinite forms. As the Supreme Court said of a different statute in United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1946):

> "We think that the language Congress used provides an adequate warning as to what conduct falls under its ban, and marks boundaries sufficiently distinct for judges and juries fairly to administer the law in accordance with the will of Congress. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense."

#### B. *Bill of Attainder.*

■ Appellants argue that § 207(a) is a bill of attainder in violation of Article I, section 9 of the constitution because it is a legislative act that imposes "punishment" on a group without a judicial trial. They emphasize, both with respect to their bill of attainder claim, and the *ex post facto* argument later discussed, that the "punishment" to which they refer is not the penal sanction which would be judicially imposed for a completed violation of § 207(a), but "the disqualification which former employees in general, and Nasser, as a practicing attorney in particular, suffer as a result of their former employment by the Government."

The group punished by § 207(a), as they see it, consists of all government employees, and the punishment imposed is the restriction of their practice of law or similar activity after leaving the government so as to exclude representation of others in government matters in which the particular employee participated personally and substantially when he was an employee.

We are unable to agree with the analysis that this particular restriction is a punishment legislatively imposed upon a specified group. Rather, the statute is within the classification of a rule of general applicability for the accomplishment of a legitimate legislative purpose. The purpose of protecting the government, which can act only through agents, from the use against it by former agents of information gained in the course of their agency, is clearly a proper one. The restriction, against acting as agent or attorney for another in a matter in which the person participated personally and substantially as an officer or employee, is equally clearly a wholly rational means of pursuing that purpose.

Appellants rely on United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), a case in which the Supreme Court struck down a law as a bill of attainder. That law disqualified all present and recent (within five years) members of the Communist Party from holding union office. The Court identified as a proper legislative purpose the exclusion from union office of persons likely to incite political strikes. The law did not provide for a judicial or quasi-judicial determination of which persons would have such intent, but was itself a legislative judgment that members of the specified group would have it and therefore constituted a bill of attainder. The Court deemed it impossible to rely upon a supposition that membership or recent membership in the Communist Party was "merely an equivalent, shorthand way of expressing those characteristics which render likely the incitement of political strikes." P. 456, footnote 31, 85 S.Ct. p. 1719.

It happened, also, that in *Brown* the Court explained why § 32 of the Banking Act of 1933, 12 U.S.C. § 78, is not a bill of attainder, although it may be said to impose a restriction upon those who fulfill certain specifications, as in the case now before us. Persons engaged in certain types of securities transactions are disqualified, by § 32, from serving at the same time as an officer, director, or employee of a member bank of the federal reserve system. After noting that the banking act provision does not inflict a deprivation upon a political group, the Court said it did not incorporate a judgment censuring any group of men, but was based on a conclusion "that the concurrent holding of the two designated positions would present a temptation to *any* man—not just certain men or members of a certain political party," and established an objective standard of conduct.

The conclusion underlying § 207(a), before us, that one who, after leaving government employment, acts for another in a matter in which he participated while in such employment, is likely to use against the government an advantage gained out of being the government's agent is a common sense conclusion similar to the one underlying the banking act provision considered by the Court. We have no difficulty in finding that § 207(a) is comparable, and deeming it a generally applicable rule of conduct rather than a bill of attainder.

### C. *Ex Post Facto Law.*

When appellant Nasser became an employee of the United States, and during most of his service, he was subject to 18 U.S.C. § 284, 62 Stat. 698, a restriction on his practice of law or similar activity in the event of leaving government employment. A few months before he left, however, Congress revised and reenacted § 284 as § 207(a), effective in January, 1963.

The difference has been described in Senate Report No. 2213, Sept. 29, 1962, 2 U.S.Code Congressional and Administrative News, 1962, p. 3861, in part as follows:

"Section 207 replaces title 18, United States Code, section 284 dealing with postemployment activities. The latter prohibits a former employee of the Government, for a 2-year period following the termination of his employment, from prosecuting a claim

against the United States involving any subject matter directly connected with which he was employed . . .

"Subsection (a) of section 207 provides that a former Government officer or employee . . . shall be permanently barred from acting as attorney or agent for anyone other than the United States in any matter in which the United States is a party or is interested and in which he participated personally and substantially in a governmental capacity. Thus, in addition to replacing the present 2-year disqualification with a lifetime bar, section 207(a) strengthens present law by going beyond claims for money or property to the whole range of matters in which the Government has an interest."

Appellants argue that § 207(a) as applied to Nasser is an *ex post facto* law in violation of Article 1, section 9 of the constitution because it more closely restricts post-employment activity than did the law in effect during most of his period of employment.

▮▮▮▮ For reasons similar to those discussed with respect to the bill of attainder claim, we do not view the restriction on post-employment activity related to activity during employment as punishment for having been a government employee before the law was enacted.

As appellants argue, disqualification from practicing a profession, on account of offensive activity, may constitute punishment therefor and a law newly prescribing such disqualification on account of activity occurring before the law was passed may be an *ex post facto* law. Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867), and Ex parte Garland, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867). But where there is a sufficiently rational relationship between the past activity and the public interest in excluding unworthy people, the disqualification is not a punishment

and a law newly imposing it is not an *ex post facto* law. Ex parte Garland, p. 379; Hawker v. New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898); Cases v. United States, 131 F.2d 916 (1st Cir., 1942) cert. denied sub nom., Velazquez v. United States, 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718 (1943); Smith v. United States, 312 F.2d 119 (10th Cir., 1963).

§ 207(a) does not disqualify former government employees from all or a segment of the practice of law. It disqualifies only from particular cases where Congress could rationally make the judgment that participation would be evil as a result of an individual's previous activity as a government employee in the same matter.

Appellants' argument that the disqualification itself was new implies that if § 207(a) had not been passed, Nasser would have been free to participate, after termination of his employment, as attorney in a government matter in which he had substantially participated as a government employee. Although § 207(a) provided penal sanctions which did not previously exist, we point out that Mr. Nasser would in any event have been restricted by the ethics of his profession from accepting private employment in a matter in which he had substantial responsibility while a public employee.[2]

## II. *The theory of the case.*

The government contended in support of Count II that in 1962, while an IRS employee, Nasser had participated personally and substantially in the matter of Hauff's income tax liability for 1958. In April, 1962, he reviewed a proposed notice of deficiency and fraud penalty for 1958, together with related files, and recommended that the notice issue. In October, 1962, he prepared a memorandum answering a legal question involving the 1958 assessment.

2. See ABA Code of Professional Responsibility, D.R. 9–101(B), ABA Canon 36, 7 Am.Jur.2d 141, Attorneys at Law § 158.

The government also claimed in support of Count III participation in the matter of Hauff's liability for 1959. Hauff had filed no return for that year and Mr. Gerard, another IRS attorney, recommended criminal prosecution. In order to coordinate the two matters, Gerard and Nasser met in April and September, 1962, and discussed the Hauff case. Thus Nasser's participation relied on with respect to Hauff's 1959 liability, and Count III, was incidental to his activity concerning Hauff's 1958 liability. The participation relied on with respect to Circella's liability, and Count I, was also incidental. The Hauff file disclosed substantial payments and other transactions in a business venture in which Hauff and Circella were associated, and there was no claim that Nasser dealt with any other matter concerning Circella. As already noted, the jury disagreed as to Count I, and it was dismissed.

Nasser left IRS May 17, 1963. In December, 1963, after Hauff sought assistance, Nasser asked Mr. Roche, another attorney, to become associated in representing Hauff concerning his '58 liability. There is substantial evidence from which it can be inferred that for some months Nasser gave the legal advice in the matter and Roche's function was limited to appearances at conferences and applying Nasser's advice. There is evidence that Nasser said he was concerned about possible conflict of interest. The defense interpretation of the evidence is that Nasser did not act as attorney, but secured Roche for Hauff in order to avoid possible conflict.

There was also evidence that Nasser prepared Hauff's 1959 return, submitted February 24, 1964, and an accompanying explanatory letter. An expert gave his opinion that the return, the letter, and a power of attorney to Roche, were each prepared on the same typewriter, respectively, as some other document shown to have been authored by Nasser. They were prepared at a secretarial service which performed services for Nasser,

but not Hauff. Roche did not prepare them.

■ We deem the evidence, when viewed in the light most favorable to the government, sufficient to support the verdict. Questions raised by appellants concerning electronic surveillance involve some of the proof of Nasser's access to the IRS files on Hauff in 1962; and there are claims of error with respect to evidence on other points. *Bruton* questions are raised because of testimony relating statements by Hauff tending to incriminate Nasser. Hauff did not take the stand. The government contends that such statements by Hauff were in furtherance of the conspiracy charged and shown. Appellants also argue that as a matter of law they could not be guilty of conspiracy to violate § 207(a).

### III. *The propriety of the conspiracy charge and conviction.*

§ 207(a) prescribes a penalty for an ex-employee who acts as attorney for a client, under specified circumstances, if he acts knowingly, but does not prescribe a penalty for the client, whether he acts knowingly, wilfully, or otherwise.

The essential question presented is whether, when a client agrees with an ex-employee of the government that the ex-employee shall act as attorney or agent in a matter from which he is foreclosed by § 207(a), and the client (as well as the ex-employee) has guilty knowledge and purpose, both may properly be found guilty of conspiring to cause a violation of § 207(a).

Count IV was arguably broader in that it charged a conspiracy among Nasser, Hauff, Circella, and unknown others, to have Nasser act as attorney for Hauff and Circella. There was evidence that Hauff brought Circella to Nasser to obtain representation and that Nasser arranged with Roche to appear for Circella, under circumstances from which it could be inferred that Nasser was really acting as the attorney. We do not un-

derstand, however, that the government attempts to sustain the conviction on the theory that the jury found that Nasser and Hauff conspired to have Nasser act unlawfully as attorney for Circella, *i. e.*, ex-employee and A conspiring to have B employ the ex-employee as his attorney in a forbidden matter.

Such an interpretation of the verdict would be dubious in that the jury could not agree that Nasser acted unlawfully for Circella. Moreover the case was not really argued nor submitted on that theory. The instructions permitted a verdict of guilty on Count IV if the jury found that Hauff knowingly and wilfully agreed that Nasser act as his attorney. There was no instruction that in order to find Nasser and Hauff guilty, the jury must find that Nasser and Hauff knowingly and wilfully agreed that Nasser act unlawfully as attorney for Circella.

In enacting § 207(a), Congress made it an offense for the ex-employee knowingly to act as agent or attorney for a client in a matter of the type specified. Agreement by the client that the ex-employee act as attorney is impliedly required. So far as § 207(a) goes, it is immaterial whether the client had knowledge of the facts which would make the ex-employee guilty of the offense, and the client is not made guilty of an offense under any circumstances. The government argues that if the client has guilty knowledge, an element it need not prove under § 207(a), the agreement that the ex-employee shall act for the client becomes a conspiracy in violation of 18 U.S.C. § 371. Thus the ex-employee, when he acted as attorney for a client who had guilty knowledge, would be guilty not only of a violation of § 207(a), and exposed to a $10,000 fine and two years' imprisonment, but also of a violation of § 371, and exposed additionally to a $10,000 fine and five years' imprisonment, and the client would be guilty of the latter and exposed to that penalty.

Of course it is possible that an ex-employee may violate § 207(a) when his client is ignorant of the fact that the ex-employee was such, or had participated in the matter as such, but we are strongly inclined to believe, in the nature of things, that where an ex-employee acts knowingly and unlawfully, his client will often know the facts. The client's knowledge of those facts will frequently have been the motive for the retainer.

Appellants argue that the case falls within one of the exceptions to the rule that a substantive offense and a conspiracy to commit it are separate and distinct offenses: (1) "where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime" (the Wharton rule); and (2) "where the definition of the substantive offense excludes from punishment for conspiracy one who voluntarily participates in another's crime." Pinkerton v. United States, 328 U.S. 640, 643, 66 S. Ct. 1180, 1182, 90 L.Ed. 818 (1946).

The Wharton rule operates to prevent conviction both of conspiracy and the substantive offense where the substantive offense could not have been committed without concerted action, so that the conspiracy is really identical with or included within the substantive offense. This is most clearly illustrated in dueling, adultery, and bigamy. See Perkins, Criminal Law 535 (1957). The government points out that in our case, the guilty knowledge of the client is an essential ingredient of conspiracy, but not of the substantive offense.

The second exception really turns upon a construction of legislative intent. In Gebardi v. United States, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932), cited in *Pinkerton*, the Supreme Court had before it the Mann Act, now 18 U. S.C. § 2421. One defendant was a man who had clearly violated the Act by transporting a woman for an immoral purpose. The other defendant was the woman, who had consented to the journey and the purpose. They were convicted of conspiracy, and the Supreme

Court reversed. Having construed the Mann Act so as not to punish the woman transported even though she consented, the Court concluded there was "an affirmative legislative policy to leave her acquiescence unpunished," precluding punishment via the conspiracy statute. And in the absence of any proof that the man conspired with others than the woman transported, his conviction could not stand.

We see, as the government argues, that there are bases for difference between the legislative attitude toward a woman transported for immoral purposes with her consent and toward a person who purposefully, in order to advance his own interests, seeks representation from an ex-employee of the government in a matter in which the latter participated when he was an employee. But in evaluating the intent of Congress in failing to prescribe a penalty in § 207(a) for the client, regardless of his degree of guilty knowledge or culpable intent, we think it more reasonable to read the omission as precluding punishment for the client than as leaving punishment for the client with guilty knowledge, up to a much greater maximum than that provided by § 207(a) for the ex-employee, to the operation of the conspiracy statute.[3] We conclude that Hauff could not be guilty of conspiracy with Nasser, nor Nasser with Hauff, solely by reason of their agreement, knowing and wilful, that Nasser act as attorney for Hauff in the forbidden matters.

Here, too, accepting the evidence that Hauff knew that Nasser's representation of him was unlawful, it happens there was evidence that Hauff participated in devices to conceal the offense. The extent to which the *Gebardi* reasoning would apply to a charge as principal, under 18 U.S.C. § 2, as accessory after the fact under 18 U.S.C. § 3, or misprision of felony under 18 U.S.C. § 4, need not be considered here, those charges being absent.

## IV. *Bruton: Right to confront witnesses.*

Government witnesses testified concerning a number of conversations with Hauff, in Nasser's absence. With varying degrees of explicitness and completeness, Hauff said in these conversations that Nasser had participated as an IRS attorney in Hauff's tax matters and was currently acting as Hauff's attorney on the same matters. Hauff did not testify and thus Nasser had no opportunity to cross-examine Hauff. Nasser's counsel objected, but the testimony was admitted, usually with a statement by the court that each was admitted against Hauff only.

Ultimately, however, the court gave an instruction that if a conspiracy has been established, the declarations of a member of the conspiracy, in furtherance of its objects, may be considered as evidence against another member of the conspiracy. The court did not identify which of Hauff's statements might be deemed in furtherance of any conspiracy.

Appellant Nasser argues that several statements by Hauff, incriminating Nasser, were not in furtherance of any conspiracy and therefore were improperly received at the joint trial under princi-

---

3. Chadwick v. United States, 141 F. 225 (6th Cir. 1905), relied on by the government, dealt with a statute providing a penalty for an officer of a bank who wilfully certified a check when there were not sufficient funds on deposit. Mrs. Chadwick, not an officer, was convicted of conspiring with an officer unlawfully to certify her check. The court held that the Wharton rule did not apply because the officer may be guilty "without the guilty complicity of the drawer or any other person." The court did not directly address the *Gebardi* type question of whether Congress' omission to provide a penalty under any circumstances for a person seeking certification of such a check indicated an intent that such person not be punished for such request. Considering the differences between the situations dealt with in the statute before the court in *Chadwick* and the statute here, it does not seem that the answers need be the same.

ples later announced in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L. Ed.2d 476 (1968).

*Bruton* held that at a joint trial, proof of a confession by one defendant, incriminating his codefendant as well, makes the first defendant, in effect, a witness against the second. Unless the second defendant has had an opportunity to cross-examine the first, the second defendant will be deprived of the right to confront a witness, and the confession must be excluded, even though otherwise admissible against the defendant who gave it. *Bruton* is to be applied retroactively, and therefore to the instant case. Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968).

Hauff's statements, just referred to, described all the elements of the substantive offenses charged against Nasser. They clearly must have had prejudicial impact.

Mrs. McAdams was an employee of Hauff in a restaurant business. She described four apparently casual conversations in which Hauff made statements incriminating Nasser. She testified to a threat by Hauff, several months later, suggesting a violent death for people who talk, but with nothing to indicate the threat related to the Nasser relationship. Hauff's earlier statements to her about the Nasser relationship could not conceivably have been in furtherance of the conspiracy, and could properly be considered against Nasser only on the tenuous theory that they permitted an inference that the threat was designed to suppress the knowledge she had gained from the earlier remarks and was thus in furtherance of the conspiracy.

Hauff's girl friend testified that at various times she (1) aided Hauff in deception of Circella for a purpose irrelevant to this case, (2) at Hauff's request falsely represented to Circella that she had paid Nasser his fee for representing

Hauff, and (3) at Hauff's request relayed to Circella statements about Nasser's former government employment and current representation of Hauff. Arguably (3) may have furthered a plan to persuade Circella to have Nasser represent him, but (1) and (2) were not even arguably in furtherance of the alleged conspiracy.

Circella testified to statements Hauff made to him similar to (3) and these arguably may have furthered that plan.

Mr. Weber is an IRS inspector who investigates misconduct by IRS employees. He interviewed Hauff in April, 1964, and Weber described his statements. Much of what Hauff said constituted denial, or was otherwise exculpatory, but there were several admissions as well as statements which, though couched in "double talk", could readily be interpreted as verifying Nasser's unlawful representation of Hauff. Hauff emphasized the thought that his testimony would be essential to any case against Nasser, that both the government and Nasser needed Hauff, and that the government case would be hearsay without Hauff. He threatened to leave town if subpoenaed and to "take the 'Fifth'" if found. Even though a good portion of these interviews contained denials or evasions, and denials may have been in furtherance of the alleged conspiracy, we can not agree with the government contention that Hauff's incriminating statements to the inspector were, because of any tendency to discourage investigation, in furtherance of the conspiracy and therefore admissible against Nasser. We surmise that, as related by the Inspector, these statements had great impact on the jury.

Even if we were satisfied that a criminal conspiracy had been properly proved, *Bruton* would compel reversal as to Nasser because significant portions of this testimony as to Hauff's statements, incriminating Nasser, could not be admitted at a joint trial.[4] Of course

4. The two defendants in *Bruton* apparently had not both been charged with conspiring to commit the offense of which both were convicted. We think, however, that

we have decided the conviction on the conspiracy count is to be reversed, but have nevertheless considered whether, on the parallel theory of a proved agency or joint venture, Hauff's statements could be charged against Nasser. We conclude they can not.

Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) established that there may be a case against a defendant relying on Bruton so overwhelming that the "violation of *Bruton* [is] harmless beyond a reasonable doubt", but the government has not asked nor have we deemed it appropriate to find the *Bruton* error harmless in this case.

### V. *Electronic Surveillance Issues.*

Much of the long history of this case revolves around certain instances of electronic surveillance and the claims (1) that they were unlawful and (2) that proper procedure was not taken to determine whether evidence used at trial was tainted by any of them.

The alleged offenses occurred after Nasser had left government service. The government was, however, required to prove that earlier, while still an employee, Nasser had participated in the Hauff and Circella tax matters. It happens that the government had conducted electronic surveillance of Nasser while still employed,[5] and appellants argue they should have been given an opportunity to learn whether the surveillance led to any of the proof the government produced.

The verdict in this case was rendered July 9, 1966. Just before trial, the district court had held that the surveillance

did not involve a trespass and was not unlawful, applying the rules as understood before Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, decided December 18, 1967.

On July 11, 1968, in the course of defendants' appeal, but on motion of the government, this court vacated the judgment and remanded the cause to the district court, so that there might be *in camera* inspection of the electronic surveillance to determine whether the convictions had been "tainted by the use of improperly obtained evidence." [6]

While the matter was again before the district court, the Supreme Court decided that *Katz* was not to be applied retroactively. Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

Again applying pre-*Katz* principles, the district court held that the electronic surveillance, with one "untainted" exception, had been lawful and reimposed sentences. Defendants again appealed.

In 1962 and '63, agents of the Internal Security Division of the service, in the course of an investigation of Nasser, installed a microphone in his IRS office and attached a "C" clamp to his office phone from which his office and telephone conversations were transmitted to an office of the investigating agents. They also installed a pen register on Nasser's home phone which recorded the numbers of outgoing calls. Certain interviews between agents and Nasser and Hauff were surreptitiously recorded.

On remand, the district court found that Nasser, but not Hauff, had standing to challenge the bugging device in Nasser's office, and that it was lawful

---

the principle of *Bruton* necessarily applies to a joint trial of defendants charged with conspiracy. If the jury hears of an out of court declaration of defendant No. 1, not in furtherance of a conspiracy independently established and not otherwise admissible against defendant No. 2, but inculpating defendant No. 2, an instruction to the jury to disregard the declaration as to defendant No. 2 is not an adequate substitute for his constitutional right of cross-examination.

5. This IRS surveillance of Nasser was also involved in United States v. Hagarty, 388 F.2d 713 (7th Cir. 1968).

6. The Supreme Court had not yet decided Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), under which an *in camera* inspection of unlawfully obtained materials would not have sufficed.

because no trespass had been committed in planting it. See Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L. Ed. 1322 (1942).

The district court found that Nasser but not Hauff had standing to challenge the pen register. It found the pen register had been installed in violation of federal wiretapping law, 47 U.S.C. § 605 (1964). It ordered that the products of this device be given to Nasser and an adversary hearing held to determine the question of taint, under *Alderman.* At the hearing, the court found no taint, and the finding is presently not challenged.

The district court held that each defendant had standing to challenge any recorded interviews in which he was a participant. But it found these interviews lawful under the principles in force before *Katz,* because "a government agent could record a conversation with a defendant without his knowledge and not violate his Fourth Amendment rights." This ruling is not challenged, and its merit need not be considered.

Appellants here maintain their original assertion that the surveillance of Nasser's office was an "indiscriminate search" in violation of the fourth and fifth amendments, and that the district court should have ordered production of the materials and granted a hearing on the question of taint. See Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); cf. United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

As to the primary issue of whether the agents trespassed when planting the electronic devices, defendants emphasize that Nasser's office was assigned to him for his exclusive use, making the entry of the agents, unauthorized by him, a trespass.

 We agree with defendants that a government office as well as one in the private sector is not a public area, and trespass can be committed against the one who occupies the office. This is illustrated in United States v. Blok, 88

U.S.App.D.C. 326, 188 F.2d 1019 (1951), where a supervisor's consent to a search by local police of a government employee's desk for evidence of a crime unrelated to the employee's work was held invalid under the fourth amendment.

 In so doing, however, the court said,

"No doubt a search of it without her consent would have been reasonable if made by some people in some circumstances. Her official superiors might reasonably have searched the desk for official property needed for official use."

We believe this element of work-relatedness is where the trespass line must be drawn. The surveillance in the present case was undertaken by representatives of IRS to determine whether its work was being properly performed by an IRS employee in the areas assigned to him for the purpose of such work. We conclude, because of the relationship of the surveillance activity to the work Nasser was to perform that there was no trespass involved and that under the law as it stood before *Katz,* there was not an unreasonable search and seizure within the fourth amendment.

In United States v. Collins, 349 F.2d 863 (2d Cir. 1965), cert. denied, 383 U. S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303 (1966), the warrantless search of a Customs Service employee's jacket by Customs agents for emeralds stolen from Customs mail was held reasonable:

"We have no doubt that the search of defendant's work area, including the surface and interior of his desk, conducted by Customs Agents McDonnell . . . was a constitutional exercise of the power of the Government as defendant's employer, to supervise and investigate the performance of his duties as a Customs employee. . . . The agents were not investigating a crime unconnected with the performance of defendant's duties as a Customs employee."

 The late entry of electronic surveillance into fourth amendment doc-

trines requires that we analogize seized words to seized "persons, papers and effects." Here the words seized were related and part of Nasser's official function, and by analogy were "things" related to Nasser's official duties. See Berger v. New York, 388 U.S. 41, 51, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

Appellants rely on this court's decision in United States v. Hagarty[7] holding that an intercepted conversation between Nasser and Hagarty could not be used to convict Hagarty. Although *Hagarty* (without the benefit of *Desist*) applied *Katz* retroactively, appellants argue that portions of *Hagarty* were independent of *Katz* in holding that the IRS could not conduct electronic surveillance of its own employee in his assigned office, for the purpose of detecting his failures to perform his duties. We conclude, however, that any discussion in *Hagarty* which might be so interpreted was predicated on *Katz* principles, and that, by reason of *Desist*, does not govern transactions occurring before December 18, 1967, the date of the *Katz* decision.

Appellant Hauff raised the issue that the government not only must report in full all instances and surrounding circumstances of electronic surveillance which it discloses, but must also affirmatively deny that the defendant was subjected to any other electronic surveillance. And where the government admits to eavesdropping and is prepared to argue its legality, appellant maintains he is entitled to an adversary hearing at which he may cross-examine the government witness.

Appellant relies on a "general reading" of Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), for the claim that the government must formally and affirmatively state that it has disclosed in full.

We do not find this in *Alderman* because that case dealt with the procedure to be followed "when an illegal search has come to light." Id. at 183, 89 S.Ct. at 972. Furthermore, the rationale of *Alderman* was not

". . . lack of confidence in the integrity of government counsel or the trial judge, but only [that] the *in camera* procedures at issue there would have been an inadequate means to safeguard a defendant's Fourth Amendment rights." Taglianetti v. United States, 394 U.S. 316, 317, 89 S.Ct. 1099, 1101, 22 L.Ed.2d 302 (1969).

The problem of insuring access to information in the hands of the government which it has a duty to disclose would be an important issue in a proper case. But we do not believe this is the case, both because the appellant came forward with no substantial basis for doubting that the government engaged in unreported unlawful eavesdropping,[8] and because we have reviewed the record of the suppression hearing and find, in the testimony, reason to believe that the government did disclose in full.

■ Summarizing so far, we agree with the government that the records produced from the bugging device in Nasser's office need not be disclosed to appellants; the questions concerning the pen register materials have been resolved; and there is no challenge with respect to recordings of interviews between appellants and representatives of the government.

Appellants do not press, on appeal, the argument made in the district court that the interception of telephone messages in Nasser's office by means of the "C" clamp violated 47 U.S.C. § 605 and entitled Nasser to a taint hearing on the material. Accordingly, we do not decide the point.

After the trial, appellants discovered Administrative Circular No. 41 from the Secretary of the Treasury, dated June 9,

---

7. 388 F.2d 713 (7th Cir. 1968).

8. See Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307, 312 (1932); Gordon v. United States, 438 F.2d 858, 865–866 (5th Cir. 1971).

1961. It states a policy against monitoring telephone calls to or from Department offices, and provides that the right to use mechanical or electronic recording equipment shall be subject to prior approval of the Secretary or the Under Secretary. The government counters with a memorandum from the Secretary, dated June 20, 1961, which asks that chiefs of Treasury enforcement agencies be advised "that Administrative Circular No. 41 is not intended to affect investigative techniques currently employed by them in pursuance of their responsibility under existing laws and regulations."

 In the absence of material amplifying those two documents, we conclude that Circular No. 41 was not directed at surveillance in the course of, internal investigations such as employed in Nasser's office.

## VI. *Claims of Procedural Error before and at trial.*

Appellants make a number of other arguments concerning procedural steps. Some of the questions would be unlikely to be presented in the same posture in the event of a retrial. In one instance, we do agree that the district court made an erroneous ruling.

Circella was a government witness. The defense suggested that his testimony was motivated by a promise of immunity. On cross-examination he admitted meeting with Inspector Weber on a number of occasions in company with Circella's attorney. He said he did not remember the matter of immunity coming up and that the government had not made any promises to him for testifying.

The defense called the attorney as a witness and asked if he had been present at the meeting of Circella and the representatives of the government. He refused to answer on the ground of his client's instructions to assert the at-

torney-client privilege, and the court sustained his position.

 We think it clear that the communications in the course of those meetings were not privileged. Leathers v. United States, 250 F.2d 159, 166 (9th Cir. 1957), citing Wigmore on Evidence, 3d Ed., Vol. 8, p. 602, § 2311.

The judgments are reversed and the causes remanded for further proceedings consistent with this opinion.

STEVENS, Circuit Judge (dissenting in part).

The lawyer, not the client, is primarily responsible for avoiding conflicts of interest. Indeed, in numerous situations the client may be unaware of the potential conflict; in others, he might reasonably assume that the conflict is unobjectionable. In such cases, compliance with § 207(a) is solely the responsibility of the lawyer; since the client's consent is then merely an element of the lawyer's crime, it does not create a conspiracy. *Cf.* Gebardi v. United States, 287 U.S. 112, 119–123, 53 S.Ct. 35, 77 L.Ed. 206.

But there are cases in which the client's involvement is of critical importance. If the client knows the disqualifying chapter in the lawyer's history, and also is conscious of the illegal character of the employment, and nevertheless retains him, it is probable that he is motivated by a desire to obtain an advantage that the law specifically forbids. In such a case the client's intent, unlike the mere acquiescence of the concubine, characterizes a bargain which is more corrupt than the substantive offense itself. Such a bargain, in my opinion, is a conspiracy within the meaning of 18 U.S.C. § 371. United States v. Holte, 236 U.S. 140, 145, 35 S.Ct. 271, 59 L.Ed. 504.[1]

In this case the jury found that the lawyer and his client were partners in such a corrupt bargain. Comments by

---

1. *Gebardi* involved mere "concurrence . . . without more," see 287 U.S. at 120, 121, 122, 123, 53 S.Ct. 35; *Holte* was distinguished, not overruled. In this case, however, the client's wrongful intent is not an element of the lawyer's substantive offense.

the client acknowledging the retainer and its illegal character were therefore against his penal interest and admissible against the lawyer. See Rule 804(b)(4) and Advisory Committee note thereon, Rules of Evidence for the United States Courts and Magistrates. *Cf.* Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297. Hauff's declarations to Weber, Hanel, McAdams, and Circella, which were only admitted against Hauff, would not violate Nasser's right of confrontation as interpreted in Bruton v. United States if they were either admissible against Nasser "under traditional rules of evidence," see 391 U.S. 123, 128 n. 3, 88 S. Ct. 1620, 20 L.Ed.2d 476, or if their trustworthiness is otherwise supported by adequate "indicia of reliability." See Dutton v. Evans, 400 U.S. 74, 89, 91 S. Ct. 210, 27 L.Ed.2d 213 (opinion of Mr. Justice Stewart). Since it seems unlikely that the impact of Hauff's declarations on the jury was disproportionate to their reliability, I question the validity of the *Bruton* objection to most of those declarations.

I concur in part IA, IB, IC, V and VI of Judge Fairchild's opinion.